Filed 12/15/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| Adoption of BABY BOY W., a Minor. | |
| GARRETT J., | D066101 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. A59385) |
| A.H. et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of San Diego County, David B. Oberholtzer, Judge. Affirmed.

Law Offices of Ted R. Youmans, Ted R. Youmans; Leslie A. Barry for Defendants and Appellants A.H. and M.H.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant Jacqueline W.

A.C. Howard Law and Anna C. Howard for Plaintiff and Respondent Garrett J.

A biological father who does not qualify as a presumed father under Family Code section 7611[1] generally does not have statutory standing to block the adoption of his child unless he proves that it is in the child's best interests that the adoption not proceed. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*); *Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1052 (*Michael H.*).) Under *Kelsey S.*, however, the father has a constitutional right to establish himself as a quasi-presumed or *Kelsey S.* father if he "promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise . . . ." (*Kelsey S.*, *supra*, at p. 849; *In re M.C.* (2011) 195 Cal.App.4th 197, 213.)

Jacqueline W. and Garrett J. are the unwed biological parents of Baby Boy W. When Jacqueline discovered that she was pregnant, she knew right away that Garrett was Baby Boy W.'s biological father, but she denied Garrett's requests that she sign a voluntary declaration of paternity that would have established Garrett as Baby Boy W.'s statutory presumed father. She then sought to have A.H. and M.H. (the Hs) adopt Baby Boy W. at birth, despite the fact that Garrett had repeatedly stated that he wanted to raise Baby Boy W. himself. Garrett filed a petition to establish his paternity, and Jacqueline and the Hs (collectively, appellants) filed a petition to terminate his parental rights. The trial court found that Garrett established his paternity rights under *Kelsey S.*, denied appellants' petition, and entered judgment in Garrett's favor, thereby halting the

---

[1]     All further statutory references are to the Family Code.

Hs' adoption of Baby Boy W. The court set further proceedings to address custody of Baby Boy W.

Appellants contend that (1) the trial court misunderstood and misapplied *Kelsey S*., and (2) there is not sufficient evidence to support the trial court's *Kelsey S*. findings. We disagree in both respects and affirm the judgment.

We have not reached this decision lightly. We understand that the consequences of our decision, i.e., halting the Hs' adoption of Baby Boy W., will undoubtedly be heartbreaking for the Hs, who have had custody of Baby Boy W. since the day after his birth. We also realize that removing Baby Boy W. from the Hs and placing him with Garrett and/or Jacqueline will require a period of adjustment for Baby Boy W. However, those emotional considerations, precipitated by Jacqueline's unilateral decision that adoption was in Baby Boy W.'s best interests, do not override Garrett's constitutional right to establish a parental relationship with Baby Boy W.

## FACTUAL AND PROCEDURAL BACKRGOUND[2]

Jacqueline and Garrett met at a party in the summer of 2012 when they were both students at the University of Alabama. Within weeks, they were dating exclusively.[3] On

___

[2] Although we ordinarily view " 'all factual matters most favorably to the prevailing party and in support of the judgment' " (*Adoption of A.S.* (2012) 212 Cal.App.4th 188, 209), we are mindful that the trial court found Garrett's testimony "not reliable" in some respects. As the trial court explained, Garrett's "embellishments and excuses over three days of testimony eventually convinced the court he was not reliable. The court is not suggesting it believed none of [Garrett's] testimony—it relied on much of it to reach a decision. Nevertheless, when others contradicted him, the court generally found that other testimony more convincing."

April 23, 2013, Jacqueline told Garrett via text message that she thought she might be pregnant. Jacqueline went to Garrett's house and took two pregnancy tests, both of which yielded positive results. The next day, Garrett went with Jacqueline to the Tuscaloosa Pregnancy Center, where medical staff confirmed Jacqueline's pregnancy. Garrett stood with Jacqueline as she received her results. Jacqueline testified that Garrett was "relatively" supportive during this time; pregnancy center staff noted that Garrett "was very supportive."

The day after they went to the pregnancy center, Jacqueline found a text message on Garrett's phone that he had sent to a friend the prior weekend. The message included a photograph of Garrett hugging another girl and accompanying text suggesting that he and the girl in the photograph had been intimate. Jacqueline was very upset by the message. Garrett downplayed it as a joke.

Over the following days, Garrett and Jacqueline had extensive discussions about the pregnancy, living arrangements, how they would complete school, how they would pay all of the expenses associated with having a child, and whether they should live in San Diego near Jacqueline's family, or in Alabama near Garrett's family, who live in Georgia. Garrett testified that Jacqueline and he did not discuss abortion or adoption as options during those conversations. Garrett also testified that he asked Jacqueline to marry him, but the trial court did not believe him.

_____

3    The trial court found that Garrett "was not as exclusive," which created "tension in the relationship." The court further found that Garrett "unconvincingly denied any indiscretions during his testimony, which began the erosion of his credibility."

Jacqueline and Garrett agreed that they would keep the news of her pregnancy relatively private, telling only their families and very few close friends. Garrett was with Jacqueline when she called her parents to tell them. Jacqueline's father, Norman, was out of town on business at the time, so Jacqueline initially told only her mother, Grace. Garrett also spoke with Grace during that call. Jacqueline and Garrett each spoke with Norman a few days later. Jacqueline and Norman both characterized Garrett as supportive during this time.

At the end of April 2013, Jacqueline went with Garrett to Atlanta for four or five days to meet his parents and brothers and to do some sightseeing. Garrett had already told his brothers about the pregnancy, but did not tell his parents until a few days after the trip ended. According to Jacqueline, "[h]e wanted to make sure it was official when [Jacqueline] went to the first doctor's appointment. He didn't want to freak anyone out early."

After the Atlanta trip, Jacqueline returned to San Diego on May 5 and then continued on to Italy in mid-May for a prearranged study-abroad program. Jacqueline and Garrett communicated daily while she was in Italy. When Jacqueline complained of itchy skin, Garrett researched potential remedies.

Jacqueline returned to San Diego in late June 2013. Around the same time, Garrett changed his college major to one that would allow him to take online courses remotely in the fall semester.

5

On July 1, Garrett flew to San Diego to visit Jacqueline and her family. Jacqueline stayed with her parents in their home and Garrett stayed in their nearby beach house. Garrett and Jacqueline spent every day together, visited with Jacqueline's extended family and friends, and went sightseeing. Garrett acknowledged to Jacqueline's family that he was Baby Boy W.'s father. Garrett gave Jacqueline back rubs and, on one occasion when she suffered stomach cramps while sightseeing, moved her inside a cool hotel and got some ice water for her. According to Garrett, during this visit he offered his financial support, telling Jacqueline and her parents to let him know if there was anything he could do to help.[4] Jacqueline's parents responded that it wasn't necessary; Jacqueline was covered on their health insurance, and Grace worked for Jacqueline's doctor and was able to receive health care at a discounted rate. Garrett testified that he also looked into whether Jacqueline would qualify for state assistance in Alabama.

During the July visit, Garrett spoke with Norman about plans for Baby Boy W. According to Garrett, Norman assumed that Garrett was eventually going to try to take Baby Boy W. back to Alabama, even though Garrett was exploring the possibility of relocating to San Diego. While in San Diego, Garrett contacted a rental office about potential housing and also contacted connections from Alabama about potential work opportunities in San Diego. According to Garrett, Norman expressed his view that Garrett was not mature enough to raise a child and that adoption was the best plan. Garrett responded that he would never agree to an adoption.

---

[4]     Jacqueline and Norman denied this.

Also during the July visit, Garrett had a one-on-one lunch with Michael M., a friend of Jacqueline's family who considered himself a "big brother figure" to Jacqueline. Garrett and Michael discussed common life experiences and Michael questioned Garrett regarding his views on the pregnancy and fatherhood. Michael attempted to convey to Garrett what being a father was like so that Garrett would "understand that he was faced with [a] decision that was life-altering . . . ." Michael testified that based on his relationship with Garrett, "as short as that was, I felt he confided and trusted in me. I do know he felt there was obligation with raising the child. There is no doubt about that." Michael was also "impressed" with Garrett's level of concern for Jacqueline; it was apparent "he cared a lot about [Jacqueline]."

Michael asked Garret, "What is your perfect situation? If you could have it any way, what would that be?" Garrett's response "was very clear, 'I would have [Jacqueline] move to Tuscaloosa. We would have the baby there. I would essentially do school online and [Jacqueline] would finish school.' " After Michael "paint[ed] a picture" of what that would be like financially and emotionally, Garrett acknowledged his "perfect" option was unrealistic, and offered as a fallback plan moving to Georgia to be near his family and having his mother help him raise Baby Boy W.

During Garrett's visit, Jacqueline received a text message from a friend in Alabama saying that she had heard through the grapevine that Jacqueline was pregnant. Despite the fact that Jacqueline had told one friend about the pregnancy who, in turn, had told another, Jacqueline attributed the root of the "grapevine" to Garrett's having told his

7

best friend, "who is known for getting drunk and telling everyone absolutely anything that they choose to know." Jacqueline was upset that word of her pregnancy was spreading.

The night before Garrett left San Diego, he and Jacqueline discussed their relationship and the possibility of adoption. According to Jacqueline, she emphasized that it was important to her that Baby Boy W. be raised in a two-parent home, "but [Garrett] made it obvious there would not be a commitment." Jacqueline testified that she told Garrett, "I can't support a relationship any more if the other half isn't helping. He took that as we should be broken up, because I can't support a relationship because I am three, four months pregnant then." Garrett testified that Jacqueline gave him an ultimatum: " 'You are going to have to understand this adoption will happen or I can't support our relationship.' " Garrett left his watch as a gift for Jacqueline and returned to Alabama.

Jacqueline and Garrett continued to communicate daily via telephone, text messages, and e-mail. Garrett also communicated with Norman, who had asked Garrett to prepare a financial plan showing how he could provide for Baby Boy W. Garrett prepared a plan and sent it to Norman, who considered the plan "basically useless."

Jacqueline and Garrett's communications with each other became more brief and their conversations turned "strain[ed]" and "hostile." During a telephone conversation in mid-July, Garrett became angry with Jacqueline regarding her expressed desire that their baby be adopted. Garrett yelled that she "was making a bad decision" that she "was

8

going to regret . . . for the rest of [her] life, that [she] could suck it up and [she] could do it . . . ."  Norman overheard the argument as he was driving Jacqueline home from her job.  Garrett later sent Jacqueline a text message stating, "you cuss me out every time we talk," to which she responded, "Not 'every time.'  But you still some how [*sic*] think we should be together."

An exchange of text messages on July 28 demonstrates the tension that Jacqueline's decision to relinquish Baby Boy W. for adoption had created between her and Garrett.  Jacqueline wrote, "Garrett I feel like I'm just wondering [*sic*] around waiting for an answer.  All I want is someone to hear what I've said because no one has bothered to listen to that.  I just want this to all go away—it's like a bad dream and every morning I wake up and it's still there.  I'm in pain Garrett[,] I'm so sad and all I want is for this to be over.  It's constant[,] it never goes away.  I know you're a great person and you have a lot of integrity but at this point I need to be supported in my decision.  I can't even tell you how hard this is for me.  I need support in the right places now.  I want this pain to go away[,] its [*sic*] constant and never leaves."

Garrett responded, "I understand.  I hurt everyday too.  Everything is turned upside down and nothing makes sence [*sic*].  I understand and I really get how you feel.  I know why you want to make this go away and I really understand some parts of what you're going through because I am going through some of the same things.  I'm worried about you and I'm worried about all the things that are going to change.  I'm upset cause now I don't even have the love of my life anymore when all I wanted to do was to avoid

making a permanent decision during temporary times of pain. You say things to me that ring in my head when all that I used to think about was good memories of you, and things [I] like[d] doing with you. Even though you've told me enough times you don't wanna be with me. I still love you more than [I'll] ever be able to love anyone else. I'm on your side and you don't need to push me away."

Jacqueline replied, "I know that you hurt Garrett[,] you've made that very clear but please understand that every time you disagree with me and tell me I'm making a bad decision it pushes me away farther. Adoption is a better 'permanent solution' for me because I can't be a mother and feel this pain. I've told you that too many times and at this point I'm aware that its [*sic*] beyond comprehension for you to understand how much I hurt because you're not going through it. I respect you very much for telling me you love me throughout this but it is very hard for me to listen to you say you understand how much I hurt and you're worried about me when I'm still not supported. Like I said—I know you can't understand what I'm going through by [*sic*] please try and understand why my decision has been made. I'm not fit to be a mother and having a baby will not fix me or make me feel better. I'm doing the best I can and trying to ignore the pain but it only hurts more when this is being said back to me."

In August 2013, Garrett sent Jacqueline flowers on her birthday. Norman traveled to Tuscaloosa to pack up Jacqueline's belongings because she would not be returning to school. Garrett took the day off work and helped Norman pack Jacqueline's things. At the end of the day, they went to dinner together. Garrett characterized the dinner as

10

uncomfortable, claiming that Norman said, "Do you know if I would have had the chance, I would have pulled a gun and shot you by now?"[5] Garrett testified that Norman gave a long list of reasons why Garrett was wrong for not going along with Jacqueline's plan of adoption and for making her fight with him over it.

On August 20, Jacqueline sent Garrett a text message asking, "Hey I was wondering if you would be more willing to consider adoption if we could find a couple in Alabama or Georgia?" Garrett responded, "It's not really about where the family would be. It's about wanting to directly raise my child with the same values given to me by my parents and my family. I see no valid argument to give our child away. I can endure any challenge For [*sic*] my child. Family is everything and this child is family. It will not be placed into the home of a stranger."

Jacqueline was working a sales job at Nordstrom, working Sundays at a small cafe where she had worked during high school, and also watching Michael and his wife's child. Jacqueline testified that she worked because "I wanted something to keep my mind off of everything and because I needed money and needed some sort of income." She received emotional support from her parents and from a life coach, whom she paid $120 per session.

---

[5] Norman denied ever threatening to shoot Garrett. However, he admitted having said, "I now understand why father[s] and shotguns cause shotgun weddings, or something . . . to that effect."

11

Garrett continued his college studies, read several parenting books, and established a full nursery at his parents' house. He taught guitar in a music store and played in several bands, earning approximately $600 to $700 per month.

On or about August 21, Garrett was at a bar with some friends, saw a female acquaintance there, and kissed her goodbye when he left. Jacqueline received a text message that said "Garrett is making out at the bar with some blonde girl." Jacqueline was "devastated." Garrett subsequently wrote a letter to Jacqueline, apologizing for the incident. He later attended a formal ball with the girl from the bar, but claimed that they had gone just as friends.

Jacqueline stopped responding to Garrett's text messages in early September. Around that time, she interviewed the Hs as prospective adoptive parents for Baby Boy W. Jacqueline advised the Hs that Garrett was opposed to adoption. Jacqueline testified that even at that point in time, she would have married Garrett and raised Baby Boy W. together—if he had only proposed.[6]

On September 17, Garrett filed a paternity action in San Diego. According to Jacqueline, she had not decided to put Baby Boy W. up for adoption until after the kissing incident and Garrett's filing of the paternity action. She later filed a petition to terminate Garrett's parental rights and sought to consolidate his petition with hers. Garrett and Jacqueline effectively stopped communicating, other than through counsel.

_____

[6]    Jacqueline testified that she and Garrett had previously discussed the possibility of marriage, that she knew he was willing to marry her, but that she never pressed the issue because she "shouldn't have to tell someone I want to get married."

At a November 5 hearing, the court accepted the parties' stipulation for DNA paternity testing upon Baby Boy W.'s birth, consolidated the actions, and stayed further proceedings on Garrett's petition pending a final determination on Jacqueline's petition.

Disappointed with the trial court's stay of proceedings on his petition, Garrett created an online petition through the Change.org Web site urging "California law makers" to "[a]llow unmarried fathers to be able to have rights in determining the futures of their biological children," and "specifically in halting an unwanted adoption." He also created a related page on the social media Web site Facebook asking readers to "Help me Keep my Child From Being put up for Adoption." Garrett's online posts did not identify Jacqueline by name, but she believed that the posts revealed enough demographic information about her that people who knew her would know to whom Garrett was referring. In the trial court's words, "many crazies and malcontents" responded to Garret's social media postings; Garrett did not disclaim them. To the contrary, he forwarded to Jacqueline an e-mail that he received from a woman who said that she regretted having given up her child for adoption and offered to talk to Jacqueline to encourage her not to go through with the adoption. Jacqueline was devastated when she read the e-mail. She cried so hard that her mother was afraid that she would go into labor.[7] Although Garrett testified that he thought that sending the e-mail to Jacqueline was supportive, the trial court found that "[i]t was nothing of the sort, of course, and no sensitive person would have said it was." Garrett also gave a radio interview that was

_____

[7] Jacqueline had a high-risk pregnancy due to placenta previa.

broadcast in San Diego. Jacqueline was upset by Garrett's social media campaign and the responses that it elicited. Norman left Garrett a voice mail asking him to remove the online posts, but Garrett never returned the call and never removed the posts.

On December 2, Garrett sent Jacqueline a check for $1,000 for pregnancy and birth expenses. On December 18, he sent her another check for $250. He sent additional checks for $100 each in January and February 2014. All of the checks were sent through Garrett's counsel. Jacqueline never cashed any of the checks because she "felt he was just doing it for litigation purposes."

Garrett also sent Jacqueline baby supplies in December. His mother made two purchases on his behalf, which totaled more than $250 in goods, and cost approximately $50 to ship. Garrett personally made a third purchase of baby supplies that cost approximately $36 to ship.

On December 18, Garrett wrote in an e-mail to Jacqueline, "I just want to know when our baby is born so I can come see it right away." Jacqueline never responded, reasoning that Garrett already knew when the baby would be born because she had previously told him that her due date was December 22.[8]

Baby Boy W. was born in San Diego on December 23. Garrett was not present. The next day, Jacqueline relinquished custody of Baby Boy W. to the Hs by signing an

---

[8]    Jacqueline acknowledged that the initial due date had changed when medical staff realized that she was further along than they had initially thought.

independent adoption placement agreement.[9]  On December 27, the Hs filed an adoption petition and Jacqueline amended her petition to add the Hs as copetitioners seeking to terminate Garrett's parental rights.  On that same day, Jacqueline's counsel sent Garrett an e-mail informing him that Jacqueline had given birth to a baby boy and that the baby was being placed for adoption.  No one informed Garrett that the Hs had already left town with Baby Boy W.

Garrett relocated to San Diego just over one week after learning of Baby Boy W.'s birth.  Within a month, he found a full-time job.  He continued taking college courses and expected to graduate in July 2014.

On January 14, 2014, results of previous DNA paternity testing confirmed that Garrett was Baby Boy W.'s biological father.

The trial court heard appellants' petition to terminate Garrett's parental rights over five days in March 2014.  On cross-examination, Jacqueline acknowledged that she knew that Garrett was Baby Boy W.'s father the moment that she found out that she was pregnant—"there was no possibility of anyone else being the father."  She also acknowledged that Garrett held himself out as Baby Boy W.'s father.  He was willing to sign a voluntary declaration of paternity, but she was not.  Jacqueline admitted that her petition alleged Garrett's paternity "on information and belief" because she "wasn't going to commit to something that could possibly ruin or destroy what [she] wanted for [her] baby."  Jacqueline acknowledged that her family is "financially well off" and that the

---

[9]     We grant the Hs' request for judicial notice.

money that Garrett sent her in December and January "was actually more money than [she] needed with regard to [her] financial support." The court found that Garrett is a presumed father under *Kelsey S.*, that he is not an unfit father, and that he had not abandoned Baby Boy W. The court filed a statement of decision and order after hearing on April 22. Appellants filed notices of appeal from the statement of decision. The court entered a judgment denying appellants' petition on June 16. Appellants then amended their notices of appeal to include the judgment.

DISCUSSION

I

Appellants challenge the trial court's finding that Garrett is a presumed father under *Kelsey S.*[10] They contend that the trial court misunderstood and misapplied *Kelsey S.* They also contend that there is insufficient evidence to support the trial court's *Kelsey S.* findings. We conclude that the trial court properly applied *Kelsey S.* and that the court's findings are supported by substantial evidence.

*Overview of Kelsey S.*

"Under California law, an unwed biological father has a right to withhold consent to the adoption of a child only if he meets the definition of a 'presumed father.' " (*Adoption of A.S.*, *supra*, 212 Cal.App.4th at p. 202.) " 'If a man is the presumed father of a child, the child cannot be adopted without his consent [citation], unless the trial court

---

[10] Jacqueline and the Hs joined in each other's respective arguments. We will therefore not distinguish which arguments were specifically advanced by which appellants.

finds, on statutorily specified grounds, that he is unfit. [Citation.] If, however, he is not a presumed father of a child, the child can be adopted without his consent, and his parental rights can be terminated, unless the court determines it is in the child's best interest for him to retain his parental rights. [Citation.]' " (*Adoption of H.R.* (2012) 205 Cal.App.4th 455, 465.)

Section 7611 sets forth the ways in which a man can attain the status of presumed father. (*Adoption of A.S.*, *supra*, 212 Cal.App.4th at p. 202.) Under that statute, a man generally is presumed to be the father of a child if he has married, or has attempted to marry, the child's mother; he has completed a voluntary declaration of paternity; or he has "receive[d] the child into his . . . home and openly holds out the child as his . . . natural child." (§ 7611, subd. (d); *Adoption of A.S.*, *supra*, at p. 202; *Adoption of H.R.*, *supra*, 205 Cal.App.4th at p. 465.) Garrett does not contend that he satisfied any of these statutory criteria, though he asserts that Jacqueline thwarted his efforts to complete a voluntary declaration of paternity.[11]

In *Kelsey S.*, the Supreme Court "established that a natural father who does not have a right to block a third party adoption as a presumed father under section 7611 may nevertheless have a constitutional right to do so." (*Adoption of A.S.*, *supra*, 212

---

[11]    A voluntary declaration of paternity must be signed by both the mother and the father to be effective. (§ 7574, subd. (b)(1) & (b)(5).) Once completed, the declaration establishes a child's paternity with "the same force and effect as a judgment for paternity issued by a court of competent jurisdiction." (§ 7573.) This litigation and, more importantly, the disruption of Baby Boy W.'s placement, could have been avoided if Jacqueline had signed the declaration. We are troubled that she refused to do so in light of her certainty that Garrett was the father, as DNA testing later confirmed.

Cal.App.4th at p. 208.)  This is because the "biological connection between father and child is unique and worthy of constitutional protection *if* the father grasps the opportunity to develop that biological connection into a full, and enduring relationship."  (*Kelsey S.*, *supra*, 1 Cal.4th at p. 838, italics added.)  Thus, the *Kelsey S.* court "held that ' "[a] father who has promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship with his under-six-month-old child should have an equally fully protected interest in preventing termination of the relationship by strangers, even if he has not as yet actually been able to form that relationship." ' [Citation.]  'If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent.  Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship.  Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother.' " ' "[12] (*Adoption of A.S.*, *supra*, at pp. 208-209.)

_____

[12]  "In *Kelsey S.*, the unwed mother sought to place the child for adoption; the natural father sought custody of the child but was prevented from achieving the status of presumed father under the provisions of what is now section 7611, subdivision (d), because he was prevented from receiving the child into his home.  [Citation.]  The court held that the statutory scheme 'violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing

18

In determining whether the biological father has demonstrated an unequivocal commitment to his parental responsibilities, "[t]he father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' " (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) "A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Ibid.*) A father's willingness to provide "emotional, financial, medical, or other assistance during pregnancy" is particularly important where the mother is a teenager and in need of this assistance.[13] (*Michael H.*, *supra*, 10 Cal.4th at p. 1055.)

"The burden is on a biological father who asserts *Kelsey S.* rights to establish the factual predicate for those rights." (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679-

of the child's best interest.' " (*Adoption of A.S.*, *supra*, 212 Cal.App.4th at p. 208.) A biological father's constitutional rights apply with equal force when, as here, the mother unilaterally precludes him from becoming a presumed father by refusing to sign a voluntary declaration of paternity despite the fact that paternity is not disputed.

[13] That said, nothing in *Kelsey S.* or *Michael H.* suggests that the father is required to love or dote on the mother, propose marriage to her, or be a compatible mate to qualify as a fully committed parent. All that is required is that he provide care and support for the mother's physical and emotional health to the extent it affects the health and welfare of the child she is carrying.

19

680.) Appellants acknowledge in their briefing that we review the trial court's decision under the substantial evidence test, viewing "all factual matters most favorably to the prevailing party and in support of the judgment, indulging all reasonable inferences and resolving all conflicts accordingly." (*Adoption of Arthur M*. (2007) 149 Cal.App.4th 704, 717.) "We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the court's order and affirm the order even if there is other evidence supporting a contrary finding." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) In applying this standard here, we are again mindful of the trial court's credibility determinations.[14]

### *The trial court properly applied* Kelsey S.

Appellants contend that the following passage from the trial court's oral announcement of its ruling demonstrates that the court misunderstood and misapplied *Kelsey S.*: "As I was looking at this, I was struck with the irony of the fact that it is easier to become a *Kelsey S.* father than it is to become a [section] 7611 father. [¶] *Kelsey S.* is all talk. [Section] 7611, you actually have to do it. They actually have to be a father." Appellants contend that this passage reveals that the trial court mistakenly believed that a

---

[14] At oral argument, the Hs' counsel cited the recently published opinion in *In re D.S.* (2014) 230 Cal.App.4th 1238, 1245 for the proposition that, although the substantial evidence standard of review applies to the trial court's factual findings, we review de novo whether those facts satisfy the legal standard established by *Kelsey S.* "In the final analysis, the point is somewhat academic in this case. The result is the same under either a deferential or independent review." (*Adoption of Arthur M*., *supra*, 149 Cal.App.4th at p. 718.)

20

father can establish *Kelsey S.* rights entirely through "cheap talk" (as the Hs pejoratively put it in their briefing on appeal) rather than through conduct. We are not convinced.

First, it was undisputed that Garrett was not pursuing presumed fatherhood status under section 7611. Therefore, the trial court's discussion of the comparative burdens under section 7611 and *Kelsey S.* was extraneous and of no moment.

Second, the trial court made its informal comments after it had already announced that it would issue a formal, written statement of decision. The court's informal preview of its ruling may not be used to impeach the subsequent formal statement of decision. (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 647 [" 'The findings and conclusions constitute the final decision of the court and an oral or written opinion cannot be resorted to for the purpose of *impeaching* or gainsaying the findings and *judgment*' "]; *Wilshire Ins. Co. v. Tuff Boy Holding, Inc.* (2001) 86 Cal.App.4th 627, 638 ["The trial court's tentative opinion has no relevance on appeal"].)

Third, and in any event, the trial court's 16-page statement of decision demonstrates that the court undertook a thorough analysis of the *Kelsey S.* factors. To the extent that appellants contend that the trial court's misunderstanding of *Kelsey S.* is repeated in the statement of decision, our discussion below regarding the substantial evidence of Garrett's actions in connection with each *Kelsey S.* factor disposes of that challenge.

Finally, although we do not agree that *Kelsey S.* "is all talk," we recognize that in cases such as the instant one, in which the father is seeking to establish his paternal rights

21

before the child is born—that is, before he has an opportunity to "receive[] the child into his . . . home and openly hold[] out the child as his . . . natural child" (§ 7611, subd. (d))—some of his evidence will necessarily be in the form of talk about his post-birth intentions. In such cases, we rely on triers of fact to weigh the evidence and make credibility determinations.

*The trial court's application of* Kelsey S. *is supported by substantial evidence*

In its statement of decision, the trial court analyzed Garrett's satisfaction of his obligations under *Kelsey S.* by considering the following seven factors: (1) "[o]nce he knows of the pregnancy, promptly attempting to assume parental responsibilities as fully as the mother will allow and his circumstances permit"; (2) "[d]emonstrating a willingness himself to assume full custody of the child—not merely to block adoption by others"; (3) "[p]ublicly acknowledging paternity"; (4) "[p]aying pregnancy and birth expenses commensurate with his ability to do so"; (5) "[p]romptly taking legal action to seek custody of the child"; (6) "[p]roviding full emotional, physical and financial support to the mother during pregnancy"; and (7) "[i]f the mother favors adoption and he objects, promptly notifying her of that opposition." The trial court found that Garrett "met some *Kelsey S*. conditions well, others imperfectly and grudgingly, but enough to preserve his constitutionally protected right to have a relationship with his biological child." Appellants acknowledge that Garrett satisfied some of the *Kelsey S*. factors, but contend that insufficient evidence supports the trial court's findings on other critical factors. We will address each factor, in turn.

22

*Promptly attempting to assume parental responsibilities*

The trial court did not make a finding specific to this factor, but our examination of the substantial evidence supporting the other *Kelsey S.* factors, as we discuss below, leads us to conclude that Garrett took a number of actions that would support a finding that he promptly attempted to assume parental responsibilities.

*Willingness to assume full custody, not merely block adoption*

The trial court found that Garrett "has stated he is willing to assume full custody of the child, but made it clear he would rely on his family if he does. For example, he testified he has a full nursery in his mother's home in Atlanta. The court notes many people [Garrett's] age rely on grandparents to help care for an infant." Substantial evidence supports this finding.

Jacqueline's family friend, Michael, testified that Garrett's "perfect" and fallback plans both involved Garrett raising Baby Boy W.; the former would involve Jacqueline, the latter would involve Garrett's mother. In either event, Michael had "no doubt" that Garrett "felt there was obligation with raising the child."

Garrett pleaded with Jacqueline in a July text message to allow him and his family to raise Baby Boy W.: "If you don't think you are a fit mother then give my family the chance to raise our child. I'm not sure why you think we are monsters. My family has a lot to offer this child and will be apart [*sic*] of its life. Since it won't be placed in adoptive custody, it is time we make arrangements to prepare for raising our child whether it be with you or with me. My hopes were to remain with you as a couple but

23

since you have decided to separate from me we will have to make alternate arrangements. However, it is certain that I will have a very close relationship with my child under ita [*sic*] biological parents custody and I wish you to have the exact same privilege."

In an exchange of text messages on July 25, Garrett wrote to Jacqueline, "Just gotta let me know what level of involvement you want to have in raising the child. It's all up to you and your family." Jacqueline responded, "What does that mean? Is that best for the baby?" Garrett replied, "Just means that I chose [*sic*] to support my child and raise it along with the support of my family, and hopefully you will choose to see that you and I can give our child everything that [it] needs to be a successful person. I truly hope that you want to make it work, because despite what you think I love you very much and know our child is blessed to have you as a mother."

Garrett read parenting books and set up a full nursery at his parents' house. He repeatedly petitioned the court for custody or visitation. In addition, he moved to San Diego just over a week after learning of Baby Boy W.'s birth and secured full-time employment within a month after that.

Appellants argue that, "like the biological father in *Adoption of O.M.* [*supra*, 169 Cal.App.4th 672], Garrett was simply seeking legal custody so that his mother could raise the baby, demonstrating that his main objective was to block an adoption." We disagree. First, *Adoption of O.M.* is factually distinguishable. The father there sought "only legal custody, while relegating physical custody to his parents until he is released from his present lengthy incarceration." (*Id*. at p. 681.) Here, although Garrett clearly intended to

24

involve his parents in Baby Boy W.'s upbringing, the record does not support a conclusion that he intended to relegate all parental responsibility to them. Second, on that point, the trial court "note[d] many people [Garrett's] age rely on grandparents to help care for an infant." Appellants have not cited any evidence or authority that would undermine this finding, particularly where the father is still finishing college. Accordingly, substantial evidence supports the trial court's finding with respect to this *Kelsey S.* factor.

### Publicly acknowledging paternity

The trial court found that Garrett "clearly, promptly and publicly informed [Jacqueline] and others he was the father of the baby." This finding is not in dispute.

### Paying pregnancy and birth-related expenses

The trial court found that Garrett "did send some money to [Jacqueline], but only after he became aware of that legal requirement, and none of it came from his own funds. (The checks, totaling $1,200, were drawn on [Garrett's] attorney's trust account; [Jacqueline] did not cash them.) Nevertheless, [Garrett] was a college student with limited means, and [Jacqueline] never asked him to contribute. *Kelsey S.* states a father must offer financial support commensurate with his ability to do so, and it is not a dispositive issue in any event." Substantial evidence supports the trial court's finding that Garrett provided adequate financial support commensurate with his ability to do so and with Jacqueline's need.

25

In 2013, Garrett earned gross income of approximately $11,000 from his part-time job and band gigs. In addition, he received a gift of $1,000 from his brother for making the dean's list, and also received an unspecified allowance from his parents to help with living expenses and his cross-country move to San Diego in January 2014. On the other side of the ledger, Garrett was one of three tenants on a residential lease with a monthly rent obligation of $1,800. Assuming that he and his roommates split that obligation equally, Garrett paid $600 per month, or $7,200 per year. Garrett was also a member of a fraternity that had dues that ranged from $2,500 to $3,500 per semester.[15] This evidence of his financial condition supports the trial court's finding that Garrett was "a college student with limited means"—a finding that is bolstered by Norman's testimony that he found Garrett's financial condition unsatisfactory.

Appellants attempt to minimize Garrett's financial contributions by asserting that "none of those funds came from his employment," and "even the few baby supplies that Garrett sent to [Jacqueline] were paid for by his mother."[16] However, appellants cite no authority for the proposition that a father's financial contributions must come "from his employment" as opposed to other sources. Indeed, public policy would not be served by

---

[15]    Garrett testified that he quit the fraternity in 2013 so that he would have more money available to provide for Baby Boy W.

[16]    The latter assertion is erroneous. Although Garrett's mother made two purchases on his behalf in Alabama, he personally made a third purchase at a Target store in North Carolina and paid to have it shipped to San Diego.

26

refusing to credit a father with financial contributions that he resourcefully obtained from sources other than his employment.[17]

In contrast to Garrett's limited financial means, substantial evidence establishes that Jacqueline did not require any financial assistance from Garrett. She received discounted medical care from her mother's employer, her health insurance covered all of her medical expenses, her family is "financially well off," and the checks that Garrett sent—which Jacqueline never cashed—were, according to Jacqueline, "actually more money than [she] needed with regard to [her] financial support." Thus, substantial evidence of Garrett's limited financial resources and Jacqueline's limited financial need support the trial court's finding regarding this *Kelsey S.* factor.

### *Promptly taking legal action*

The trial court found that Garrett "took prompt legal action to secure his paternity." This finding is not in dispute.

### *Providing full emotional, physical, and financial support to the mother*

According to the trial court, "This trial was about [Garrett's] level of commitment to emotionally supporting [Jacqueline] . . . ." Not surprisingly, then, the court made lengthy findings on this factor, from which we have distilled the following excerpt: "[Garrett] attempted to be emotionally supportive in his own way, but lacked the maturity to do so effectively. [Jacqueline] appropriately did not view [Garrett] as emotionally

---

[17] Appellants' argument appears to us to be motivated more by a desire to inflict financial pain on Garrett than to ensure that Jacqueline and Baby Boy W. received adequate prenatal care.

supportive.  As [Garrett] requested, the court has reviewed carefully 250 or so pages of texts he especially emphasized as underscoring his devotion to [Jacqueline] and the child. [Jacqueline] described how everything from [Garrett] was about him and making him feel better, that her point of view was acknowledged but disregarded, and that his actions did not match his words.  The court agrees.  [¶]  The court nonetheless finds [Garrett's] attempts at emotional support adequate, but acknowledges its struggle with the issue. . . . [¶]  [T]he court treated the issue of emotional support objectively without considering whether the mother (or the court) was impressed with [Garrett's] efforts in giving it.  The support he offered to [Jacqueline] was genuine in his mind, at least until December 2013. The court is not excusing his behavior after that, but it did come in response to [Jacqueline's] attempt to terminate his paternal rights."  Substantial evidence supports this finding.

There can be little dispute that Garrett was supportive during the first trimester of Jacqueline's pregnancy.  She admitted that he was "relatively supportive" in April when they confirmed the pregnancy at the pregnancy center, and clinic staff described Garrett as "very supportive."  Even Norman acknowledged that Garrett was supportive during this time.  When Jacqueline went to Italy in May, Garrett communicated with her daily and researched remedies for her itchy skin.  In June, he changed his college major so that he would have the option of taking online classes remotely in the event that he were to relocate.  In July, he visited Jacqueline and her family in San Diego for one week.  He explored housing and employment opportunities.  Garrett gave Jacqueline back rubs and

attended to her when she suffered from stomach cramps.  Family friend Michael testified that he was "impressed" with the level of Garrett's concern for Jacqueline and "kn[e]w that he cared enormously for" her.  Garrett left his watch for Jacqueline as a gift.  On July 9, the day after their apparent breakup, Jacqueline sent Garrett text messages telling him that he was "doing an amazing job," "you're an awesome guy," and "[y]ou're the best[,] I can't tell you enough.  Thank you."

Garrett continued to communicate with Jacqueline and even communicated with Norman regarding a financial plan.  On July 22, Garrett asked Jacqueline about her medical appointment that day and the status of her placenta previa.  He also asked whether she had a picture of an ultrasound, but none was taken that day.  Garrett then asked, "Will you on the next one"?  On July 25, he asked her about her medical appointment that day.  She responded with an image of an ultrasound, to which he responded, "[i]ncredible."  Garrett asked if Jacqueline's due date had changed and when her next appointment was.

Things between Jacqueline and Garrett changed in late July after she continued to raise the "concept" of adoption.  Although she claims not to have *decided* on adoption until September, the record contains numerous references by her in July and August to her "decision."  For example, in an August 2 exchange of text messages, Jacqueline wrote, "I really want you to be a part of my decision and support me in my decision and I would love your help in that."  Garrett responded, "Like I've said, it's not an option anymore.  I see no good reason to place my child in adoptive care when I have the option

29

and resources to provide for my child.  You will be able to finish school and so will I.  Your life is not over and I want you to be apart [*sic*] of my decision too."

In another exchange, Jacqueline asked Garrett via text message, "If you really love me, do you support me in my decisions?"  He replied, "Unfortunately I wish I could, but I can't.  I think about this all the time and what sucks is either way you've separated yourself from me, and I've lost someone who I can never replace.  [¶] I know that one day I will look back and be happy for the side I have taken.  I understand why you take the stance you do, but I wish you would understand how difficult it is [for] me to try to explain that adoption will not be an option for the child, so we need to start working together not against each other, and prepare for how this is going to be."

Jacqueline and Garrett's disagreement over adoption led her to discourage further communications from Garrett.  On August 6, he asked, "What have I done other than want to keep my child?"  Jacqueline responded, "It's not about keeping the child or keeping us together it's about what is best for the baby and what situation will be best for him or her in the long run.  Not what situation is best for us."  Garrett wrote back, "I just don't get why you would break up with me when all I want is to raise my child?  It's not about me it's about my child.  I'm going to be in its life and we need to start figuring it out[,] not arguing about adoption, because frankly its [*sic*] not going to happen."  Jacqueline replied, "We both have very different views Garrett and this is why I don't want to talk to you all the time.  It's not your way or the highway[,] it's a median that we have to decide on."

In another August 6 exchange, Garrett wrote, "I'm not choosing adoption is the thing."  Jacqueline responded, "Okay so there's no need to ask me about how I'm doing then and what I'm feeling.  My feelings havent [*sic*] changed and won't change!"  Jacqueline stopped responding to Garrett's text messages in September and largely stopped communicating with him altogether.[18]

Garrett thus found himself in the "Catch-22" contemplated by Justice Kennard in her concurring and dissenting opinion in *Michael H.*, *supra*, 10 Cal.4th at pages 1068-1069:  "If in the early stages of the mother's pregnancy [the father] vigorously opposes the mother's decision to relinquish their child for adoption, he runs the risk of irreparably damaging his relationship with the mother and causing her emotional upset, quite the opposite of the emotional support he must give under *Kelsey S.* . . .  If, on the other hand, he initially acquiesces in the mother's decision to place the child for adoption, hoping to change her mind before the child is born, he has, under the majority's holding, forfeited his right to object later in the pregnancy to the child's adoption."  Garrett clearly falls in the former category.[19]

---

[18]    Given this fact, it is somewhat disingenuous for appellants to assert that "after September," Garrett "never once asked about an appointment or the baby's health."

[19]    *Michael H.* is factually distinguishable.  There, the 20-year-old biological father showed a lack of emotional support to the 15-year-old mother by (1) having two violent outbursts against her, one of which led to his arrest on charges of aggravated assault; (2) attempting suicide on the mother's 16th birthday in a trailer parked behind her house; and (3) concealing his opposition to adoption until after the child was born.  (*Michael H.*, *supra*, 10 Cal.4th at pp. 1048-1049.)  In contrast, Jacqueline acknowledged that Garrett

Appellants devote much of their briefing to the fact that Garrett never proposed to, or married Jacqueline.[20] However, they cite no authority that would support the proposition that marriage is a *Kelsey S.* factor. Nor could it be. If a biological father were to marry the mother, then he would be a presumed father under section 7611, obviating the need to conduct a *Kelsey S.* analysis. Moreover, Jacqueline testified that she knew that Garrett was willing to marry her, but added that she "shouldn't have to tell someone I want to get married."

Appellants also suggest that Garrett could not have provided Jacqueline with adequate emotional support unless he relocated to San Diego during the pregnancy. Again, they cite no authority that would indicate that doing so was necessary.[21] While Garrett's relocating to San Diego may have been Jacqueline's perfect plan, his perfect plan was for her to return to Tuscaloosa, where they met and conceived Baby Boy W.; to finish college; and to raise Baby Boy W. together. Neither parent attained his or her perfect plan. However, Jacqueline was in the unique biological position to attempt to

---

never hit her, never threatened her, and never called her a bad name. However, she testified that he was verbally abusive because he yelled at her over the telephone when they argued about adoption.

[20]  By Garrett's count, the Hs' opening brief "faults Garrett [32] times for not proposing or moving to San Diego. In [Jacqueline's] [opening] brief, his decision not to propose comes up [24] times, and his choice to remain in Alabama is criticized [27] times."

[21]  Indeed, appellants concede that the cases they cite stand for the unremarkable proposition that *Kelsey S.* requires actions, not just words; appellants do not contend that the cases are analogous to the facts of this case.

violate her own admonition against a "[my] way or the highway" negotiation tactic. *Kelsey S.*, however, does not condone such unilateral decisionmaking, even when, as here, the mother sincerely believes that adoption is in the child's best interest: "It . . . would be curious to conclude that the child's best interest is served by allowing the one parent (the mother) who wants to sever her legal ties to decide unilaterally that the only other such tie (the father's) will be cut as well. Absent a showing of a father's unfitness, his child is ill-served by allowing its mother effectively to preclude the child from ever having a meaningful relationship with its only other biological parent." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 848.)

We turn now to the conduct for which the trial court found that Garrett "has much to be modest about"—his social media campaign. While we agree that the campaign may have been ill-conceived and poorly executed, opening a Pandora's box of hurtful commentary from uninvolved third parties, the trial court was aware that Garrett resorted to it only "in response to [Jacqueline's] attempt to terminate his paternal rights"—that is, after their interests had diverged and they had become litigation adversaries. We therefore conclude that the trial court did not err by finding that the social media campaign did not disqualify Garrett from obtaining fatherhood status under *Kelsey S.*

In sum, there is substantial evidence to support the trial court's conclusion that Garrett offered sufficient emotional support to Jacqueline.

*Promptly notifying the mother of any objection to adoption*

The trial court found that Garrett "promptly informed [Jacqueline] he opposed the adoption" and that the Hs "knew [Garrett] was opposed to the adoption when they took custody of the child." These findings are not in dispute.

*Conclusion*

Under California law, an unwed mother does not have an unqualified, unilateral right to decide that her baby will be adopted and to deny the biological father his right to parent his child under either section 7611 or *Kelsey S.* Jacqueline prevented Garrett from qualifying as a presumed father under section 7611 solely by refusing to sign the voluntary declaration of paternity, which led to protracted litigation over whether Garrett qualified as a quasi-presumed or *Kelsey S.* father. Regrettably, the result of this litigation, which has spanned the first year of Baby Boy W.'s life, will inevitably be enormously painful for the Hs and disruptive, at best, to Baby Boy W.

DISPOSITION

The judgment is affirmed.  Garrett is entitled to his costs on appeal.


_____
AARON, J.


WE CONCUR:


_____
HUFFMAN, Acting P. J.


_____
McDONALD, J.