Filed 1/21/16  Adoption of Josiah P. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| Adoption of JOSIAH P., a Minor. | |
| AARON AND AMANDA P. et al., | D068215 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. A59987) |
| TYLER F., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Edlene McKenzie, Commissioner.  Reversed with directions.

Donald R. Holben & Associates and Amelia A. McDermott for Defendant and Appellant.

Joseph T. Tavano, under appointment by the Court of Appeal, for Plaintiff and Respondent Jessica K.

Ted R. Youmans and Leslie A. Barry, for Plaintiff and Respondents Aaron and Amanda P.

Tyler F. appeals from a judgment terminating his parental rights to his biological son, Josiah P., and allowing Aaron and Amanda P. (together, the P.'s) to proceed with their adoption of Josiah.  Contrary to Tyler's principal argument on appeal, the record contains substantial evidence supporting the juvenile court's finding that Tyler is not a *Kelsey S.* presumed parent.[1]  However, throughout the proceedings, the court and the San Diego County Health and Human Services Agency (Agency) failed to comply with the required inquiry and, depending on the response, notice provisions of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.).

Accordingly, we reverse the judgment and remand the matter for the sole purpose of requiring compliance with ICWA.

I.

FACTUAL BACKGROUND

We recite the evidence in a light most favorable to the court's ruling that Tyler is not a *Kelsey S.* presumed father.  (*In re Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 707 (*Arthur M.*).)  In so doing, we acknowledge that the record contains, and at times we discuss, other evidence that arguably supports a different outcome; but for

---

[1]     In *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849 (*Kelsey S.*), our Supreme Court held that an unwed father who has no statutory right to block a third party adoption by withholding consent may have a constitutional right to do so under the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution.

purposes of our appellate review, the other evidence has limited application. We defer to the juvenile court's express findings that the testimony of Jessica K., Josiah's mother, was "extremely credible"; the testimony of Tyler was "credible"; and the testimony of Kimberly F. was "not credible" and "give[n] no weight." (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1015, fn. 9 [credibility is for the trial court to determine].)

Jessica and Tyler had known each other since elementary school, although they did not begin a romantic relationship until after high school in June 2013.

At that time Jessica was financially self-sufficient, other than health insurance which her father provided. She worked fulltime at a furniture design company, was living and sharing rent with her sister, and otherwise paid for her own expenses. Tyler worked at a fast food outlet and lived with his parents. By the time of trial, his monthly pay was $1,600. Until shortly before trial, Tyler had been paying his parents $200 per month for car insurance and cellular telephone; otherwise, he had no expenses.[2] In addition, Tyler volunteered at a gym and took classes at a community college.

The parties' romantic relationship was very rocky. Tyler had a bad temper; at times, he would be out of control and put Jessica in physical danger. To her face, he used derogatory terms, calling her "a bitch" and "a slut." Tyler smoked marijuana every day,[3] often in Jessica's presence, preferring to party with his friends rather than to spend time

---

[2] At some point in time after Tyler was served with the underlying petition to terminate parental rights, Tyler began paying his parents $300 per month.

[3] Tyler did not have a medical prescription for marijuana and knew that use of marijuana was illegal.

3

with her. Jessica suspected Tyler had cheated on her a number of times, although he denied any disloyalty. By or around late 2013, each of them had planned to break up and end the relationship.

In January 2014, Jessica learned that she was pregnant. She never had any doubt that Tyler was the father, and a paternity test confirmed that Tyler was Josiah's father. During the parents' initial discussions in January, Tyler was the first to bring up the possibility of adoption. In considering other options, from January through May 2014 Tyler said he wanted to be a good parent, but he did not behave in a manner consistent with his words.

Tyler continued to smoke marijuana, despite Jessica's requests that he stop. Tyler would not get a second job, instead volunteering at a gym in his spare time, despite Jessica's requests that he work more hours to earn money for the baby. Tyler continued to frequent bars, clubs and house parties with friends instead of spending time with Jessica or working more. Tyler drove under the influence of marijuana. Tyler was arrested twice: once by the Border Patrol for smoking marijuana in the car, and once in Pacific Beach after fighting and being drunk in public.

From the beginning of her pregnancy through March 2014, Jessica had prenatal medical appointments approximately once a month, and after March they increased to every two weeks due to pregnancy-related complications. From January through May, Tyler came to only one ultrasound appointment, even though Jessica told him about each appointment and even asked him to accompany her. Although Tyler explained that he did not want to take off time from work to accompany Jessica to medical appointments,

4

he took off time in order to attend someone else's 21st birthday party. After May (for reasons explained below), Jessica did not initiate contact with Tyler for doctors' appointments or otherwise.

In May 2014, Tyler told Jessica he had been unfaithful to her. Also in May, in text messages to his friends, Tyler called Jessica "stupid" and complained that she was "acting like a cunt."

Shortly thereafter, Jessica lost her job. Tyler never offered to assist her financially — with either living or medical expenses. Indeed, other than buying a few meals and bottles of water, Tyler never once offered to — or, in fact, did — assist Jessica financially for any reason *at any time* after she became pregnant.[4] Tyler knew that Jessica had medical insurance, but he did not offer to pay or even inquire about any premiums, deductibles or birth-related expenses. Thus, after losing her job, Jessica had no source of income and was facing the responsibility of caring not only for herself but also for her baby.

In early June 2014, Jessica and Tyler broke up by mutual agreement. Within days of the break-up, Tyler admitted to Jessica's uncle that he (Tyler) was not ready to parent a child and boasted on social media that "Single life is the life." A few days later, based on

---

[4] To the extent Josiah received baby supplies from Tyler, Kimberly (Tyler's mother) actually bought and paid for them. Notably, Kimberly bought most of the larger items (e.g., car seat, high chair, bedding) *after* Josiah's birth, *after* Josiah's placement with the P.'s and *after* Tyler's deposition in the underlying consolidated paternity and adoption proceedings.

her financial concerns and the lack of emotional support from Tyler, Jessica moved into a maternity home for the remainder of her pregnancy.

Despite the move (and then cutting herself off from social media), Jessica was not hiding from Tyler; he had a way to contact her within two days of her move and was able to see her if he wanted. In fact, Tyler visited Jessica — but only once — during the time she was at the maternity home. Kimberly, Tyler's mother, was with him, and she communicated the following plan to Jessica: She (Kimberly) would raise the baby with Tyler.

Jessica gave birth to Josiah on August 24, 2014, in San Diego. The next day, Jessica signed an adoption placement agreement, giving the P.'s legal custody of Josiah, who has lived with them ever since.

II.

PROCEDURAL BACKGROUND

On June 10, 2014 — which was a week after Tyler and Jessica broke up, a few days after Jessica moved to the maternity home, and more than two months before Josiah's birth — Tyler filed a paternity action in the family court to establish a parental relationship with (and custody of) the anticipated child.[5] Approximately six weeks later, Tyler requested an order for DNA testing.

---

[5] Within one week of Jessica's move to the maternity home, Kimberly went there and served Jessica with process from Tyler's paternity action.

On August 26, 2014 — which was two days after Josiah's birth and one day after Josiah was placed with the P.'s — the P.'s filed the underlying action to terminate Tyler's parental rights. In their petition, the P.'s asserted that they had filed an adoption request; that Jessica had consented to the adoption; that even though Tyler had requested DNA testing to determine whether he was Josiah's biological father, he was not Josiah's presumed father, and therefore the P.'s adoption of Josiah could proceed without Tyler's consent. As particularly relevant, the P.'s alleged that Tyler "has not promptly come forward during the pregnancy and demonstrated a full commitment to all his parental responsibilities, emotionally, financially and otherwise, to [Jessica] and [Josiah]."

Also on August 26, 2014, the P.'s filed the Parental Notification of Indian Status form (with Indian Child Inquiry Attachment) required by rule 5.481 of the California Rules of Court.[6] In this form, Jessica disclosed that she is Josiah's mother and that she is unaware of any Indian ancestry of either her or Josiah. Although the generic Indian Child Inquiry Attachment has space to identify *two* people questioned about the child's Indian ancestry and their relationship to the child, the form in the record on appeal here identifies only Jessica and leaves blank the area to identify anyone else questioned. Significantly, the record on appeal does not indicate Tyler ever received notice or inquiry related to his possible Indian ancestry.

---

[6] Subsequent undesignated rule references are to the California Rules of Court.

In mid-September 2014, the court consolidated Tyler's paternity action with the P.'s termination of parental rights action and stayed the paternity action. The court ordered that DNA testing proceed and that the P.'s retain custody of Josiah.

Tyler responded to the P.'s petition, the Agency filed its report as ordered, and the action proceeded.

The trial on the P.'s petition to terminate Tyler's parental rights took place on April 10 and 15, 2015. The court heard testimony from Jessica, Tyler, Kimberly and Jessica's uncle and received into evidence approximately 30 exhibits. At the close of trial, the court ruled that Tyler did not meet his burden of establishing *Kelsey S.* presumed parent status of Josiah and that the P.'s adoption of Josiah was in Josiah's best interest and could proceed without Tyler's consent.

On May 5, 2015, the court filed its judgment reflecting these and related rulings,[7] and Tyler timely appealed.

## II.

## DISCUSSION

Tyler argues on appeal that the record does not contain substantial evidence to support the finding that he is not a *Kelsey S.* presumed father and that the juvenile court failed to comply with ICWA. As we explain *post*, we conclude that substantial evidence supports the court's finding that Tyler is not a *Kelsey S.* presumed father. Nonetheless,

---

7    In addition to reciting many of the factual findings, the judgment also dismissed as moot Tyler's paternity action.

8

we further conclude that the failure to ensure compliance with ICWA requires a reversal of the judgment with directions to the juvenile court.

A.    *Substantial Evidence Supports the Finding That Tyler Is Not a* Kelsey S. *Presumed Father*

As introduced *ante*, a father like Tyler — i.e., an unwed biological father who has no *statutory right* to block a third-party adoption by withholding consent — may have a *constitutional right* to do so under the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution.  (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)  To succeed with such a claim, the unwed father must prove that, after learning of the pregnancy, he "promptly c[ame] forward and demonstrate[d] a full commitment to his parental responsibilities — emotional, financial, and otherwise."[8]  (*Id.* at p. 849; see *Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1053-1054 [full commitment], 1059 [emphasizing need for prompt and timely action] (*Michael H.*).)  This standard requires the trial court to consider a number of factors, including "[t]he father's conduct both *before and after* the child's birth" and the extent to which "the mother will allow and his circumstances permit" the father to assume his parental responsibilities.  (*Kelsey S.*, at p. 849; accord, *Michael H.*, at pp. 1054, 1055, 1058.)  The father must demonstrate " 'a willingness himself to assume full custody of the child — not merely to block adoption by others.' "  (*Kelsey S.*, at p. 849.)  This includes any delay by the father in communicating his decision to tell the mother that he did not agree with the proposed

---

8    In other situations, the statutory distinction between a biological father and a presumed father is "constitutionally sufficient."  (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849; e.g., Fam. Code, § 7611.)

9

adoption.  (*Michael H.*, at p. 1060.)  Additional considerations include the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with the father's ability to do so, and prompt legal action to seek custody of the child.[9] (*Michael H.*, at p. 1060.)

There is no requirement of a showing (either way) whether Tyler loved Jessica, proposed marriage to her, or was a compatible mate for her.  (*Adoption of Baby Boy W.* (2014) 232 Cal.App.4th 438, 452, fn. 13 (*Baby Boy W.*).)  The only showing that is required under *Kelsey S.* and *Michael H.* is that Tyler "provide[d] care and support for [Jessica]'s physical and emotional health to the extent it affect[ed] the health and welfare of the child she [wa]s carrying."  (*Baby Boy W.*, at p. 452, fn. 13.)

In the juvenile court, Tyler did not meet his burden of presenting sufficient evidence to establish presumed father status under *Kelsey S.*[10] (*T.K.*, *supra*, 240 Cal.App.4th at p. 1398.)  On appeal, we review the court's ruling under the substantial evidence standard, "viewing 'all factual matters most favorably to the prevailing party and

---

[9]    No one has questioned Tyler's public acknowledgement of paternity or the promptness by which he sought legal custody.

[10]    In his opening brief, Tyler twice suggests that the juvenile court was required to determine his *Kelsey S.* presumed father status *by clear and convincing evidence*. However, Tyler does not provide authority for this suggestion, and in fact "[a]n unwed father seeking *Kelsey S.* status has the burden of showing *by a preponderance of the evidence* that he qualifies."  (*Adoption of T.K.* (2015) 240 Cal.App.4th 1392, 1398, italics added (*T.K.*).)  To the extent that evidence of a *presumed father's* "unfitness" must be shown by clear and convincing evidence when the issue is the child's best interest in an adoption proceeding (*Kelsey S.*, *supra*, 1 Cal.4th at p. 825; see Fam. Code, § 3041, subd. (b)), the issue of Tyler's "unfitness" was not reached in this case since the court determined he was not a presumed father.

in support of the judgment, indulging all reasonable inferences and resolving all conflicts accordingly.' " (*Baby Boy W.*, *supra*, 232 Cal.App.4th at p. 452.) As particularly apt in the present appeal, we look only to the substantiality of the evidence *in support of the trial court's finding*, " 'even if there is other evidence supporting a contrary finding.' " (*Id.* at p. 453; see *In re Adoption of Easley* (1966) 240 Cal.App.2d 821, 824 (*Easley*) [we assume trial court rejected evidence supporting a contrary finding]; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 370, p. 427 ["appellate court ordinarily looks only at the evidence supporting the successful party, and disregards the contrary showing"].)

As we explain, Tyler did not meet his burden of establishing a lack of substantial evidence in support of the juvenile court's ruling that he was not a *Kelsey S.* presumed father of Josiah. More specifically, the record contains substantial evidence that after learning of Jessica's pregnancy, Tyler did not promptly come forward and demonstrate a full commitment to his parental responsibilities.

### 1.    *Financial Responsibilities*

Tyler did not pay, or even inquire about paying, any of the pregnancy or birth-related medical expenses. Nor did he offer to pay, let alone actually pay, for maternity clothes for Jessica or baby supplies for Josiah. Jessica told Tyler that the doctor was concerned because she was not gaining sufficient weight, Tyler only suggested that she eat more; he did not provide any food or resources. Indeed, Tyler never once offered Jessica money for any purpose. Even after Jessica told Tyler in June 2014 that she had lost her job, he did not offer her financial assistance.

11

The lack of financial responsibility is particularly troubling here, where Tyler had at least $1,000 per month of expendable income,[11] and he chose to spend his money on marijuana and alcohol, and on frequenting bars and clubs during Jessica's pregnancy. In addition, Tyler never considered getting a second job, even though Jessica suggested he make the effort — *and* he had the time to (and did) volunteer at a gym two days a week.

Although there is no requirement that there be a showing that the biological father's lack of financial responsibility had an adverse effect on the mother, here a principal motivating factor for Jessica's move to the maternity home was her concern about her inability to support the unborn child.

### 2. *Emotional Responsibilities*

There is no requirement for a showing that the biological father's lack of emotional responsibility had an adverse effect on the mother — except, as we explained *ante*, to the extent it adversely affected the unborn child's health and welfare. (*Baby Boy W.*, *supra*, 232 Cal.App.4th at p. 452, fn. 13.) Here Jessica explained that Tyler's behavior caused her anxiety and stress — to the point that she had difficulty gaining sufficient weight during the pregnancy, resulting in risk to the unborn child.

Initially, we note that the result of each of the financial responsibilities discussed immediately above is also substantial evidence of Tyler's lack of emotional support for Jessica. In addition, Tyler's behavior — or lack of understanding or appreciation of the

---

[11]    On a monthly basis, Tyler netted $1,200 from his job, and his monthly expenses totaled $200.

effects of his behavior on Jessica — demonstrates a significant deficiency of commitment to any emotional responsibility.

Other than one ultrasound procedure early in the pregnancy, Tyler did not go to any of Jessica's doctor's appointments — even though Jessica had told Tyler about each appointment and asked him on occasion to accompany her.[12] Tyler ignored the medical care for the mother of his child, even after knowing that she was experiencing physical problems with the placenta.[13]

Jessica suspected Tyler of infidelity during the pregnancy, which he denied consistently until May 2014, when he finally told her that he had had sexual relations with someone else (whom Jessica had suspected) months earlier.[14] In addition, Tyler was texting at least five different girls; Tyler told the girl with whom he had sex that she

[12]     Tyler explained to Jessica that he did not want to take off work, but then he managed to rearrange his work schedule so that he could attend someone else's 21st birthday party.

[13]     At oral argument, Tyler's counsel acknowledged that Tyler did not accompany Jessica to doctors' appointments, but emphasized that he always texted her afterward to see how she was. Counsel did not provide record references for this statement, and given our review of the record based on citations in Tyler's opening brief, Jessica often texted Tyler after her medical appointments, and Tyler merely replied.

[14]     At oral argument, Tyler's counsel suggested that the sexual encounter should not be considered for substantial evidence purposes, because it occurred before Jessica had told Tyler she was pregnant. First, counsel did not provide a record reference for her statement, and neither the record reference in Tyler's opening brief nor our independent review of the record establishes the date of the sexual encounter. In any event, the fact of the encounter (regardless when it took place) is highly relevant to the substantiality of the evidence that Tyler was not emotionally supporting Jessica: *In May 2014*, almost four months after learning Jessica was pregnant, Tyler was still texting with the woman and suggesting that she not tell anyone.

13

should not tell anyone they were still communicating, and Tyler did not support Jessica in response to a text from another girl who called Jessica "a bitch."

Tyler called Jessica "a bitch" and "a slut" to her face; in May 2014, he referred to her as "stupid" and complained that she was "acting like a cunt" in text messages to his friends — texts that Jessica saw in May. In June 2014, after Tyler's mother served Jessica with the court process in Tyler's paternity action — which was within one week of Jessica moving to the maternity home — Tyler posted on social media, " 'You've been served.' Seth Rogan voice. BITCH."

Tyler exhibited ongoing anger issues toward Jessica during the pregnancy by both raising his voice and intimidating her.

Tyler ignored Jessica's requests that he stop smoking marijuana.[15] Indeed, Tyler smoked every day and even drove under the influence of marijuana. During the pregnancy, Tyler was arrested twice for drug- and alcohol-related offenses.[16]

Tyler never made any plans for Jessica's or the baby's physical well-being. In May 2014, Tyler suggested to Jessica that his parents could put a trailer or log cabin on their

---

[15] Although Tyler testified that he stopped smoking on June 3, 2014, Jessica testified that to *her* knowledge he never stopped. In any event, evidence that Tyler continued smoking for five months *until* June 2013 despite Jessica's requests that he stop is substantial evidence of Tyler's lack of emotional support.

[16] At oral argument, Tyler's counsel suggested that the first arrest should not be considered for substantial evidence purposes, because at the time of the arrest in January 2014, Jessica had not yet told Tyler that she was pregnant. We disagree. The fact that the second arrest — at a time Tyler knew Jessica was pregnant — was merely three months after the first arrest strongly suggests a lack of emotional responsibility on Tyler's part.

14

property so that Jessica and the child would have a place to live and Jessica and Tyler could raise their child together. Tyler even understood from Jessica that "[s]he was clear she was in agreement" to this arrangement and told this to his mother in May 2014. However, Tyler presented no evidence that he did anything to follow-up in terms of offering even the most basic living arrangements for Jessica or the baby.[17]

Tyler, not Jessica, first suggested the option of adoption, stating that he was not emotionally or financially ready to parent a child. Yet later, when Jessica told Tyler in June 2014 that she thought adoption would be best for the baby, he opposed it. Although Tyler then said he wanted to keep the child, he made no plans or attempted any arrangement whereby he could provide for the child.

        3.     *Tyler Does Not Present Persuasive Argument or Legal Authority*

Tyler's presentation on appeal emphasizes the evidence in the record that arguably supports a finding that he qualified as a *Kelsey S.* presumed father. We acknowledge that evidence and commend Tyler for the efforts reflected in that evidence, but under the substantial evidence standard of review, we " 'affirm the [trial court's ruling] *even if there is other evidence supporting a contrary finding*.' " (*Baby Boy W.*, *supra*, 232 Cal.App.4th at p. 453, italics added; see *Easley*, *supra*, 240 Cal.App.2d at p. 824 [trial court rejected evidence supporting a contrary finding]; 9 Witkin, Cal. Procedure, *supra*, § 370, p. 427

---

17    At oral argument, Tyler's counsel was critical of the trial court's finding that Kimberly's three-bedroom home might be inadequate to accommodate the child. We note that the actual ruling — "there was not sufficient room in [Kimberly's] home for all of them" — was based exclusively on Kimberly's testimony (that there were already five adults living there) and a photograph submitted on behalf of Tyler.

[appellate court "disregards" evidence not in support of finding on appeal].)  Further, Tyler's presentation of evidence does not take into consideration the juvenile court's express findings of credibility of the principal witnesses.

Tyler's focus is similarly misdirected in his reliance on *Adoption of H.R.* (2012) 205 Cal.App.4th 455 — a case in which the Court of Appeal affirmed the juvenile court's finding that the biological father had met his burden of proof that he was a *Kelsey S.* presumed father.  (*H.R.*, at pp. 468-470.)  In particular, Tyler's comparison of the evidence in *H.R.* to the evidence in the present appeal is not helpful, because under the substantial evidence standard of appellate review, the appellate court considers only the substantiality of the evidence *in support of the ruling actually made*, not the evidence that might support a contrary ruling.  (*Baby Boy W.*, *supra*, 232 Cal.App.4th at p. 453.)  At oral argument, Tyler's counsel also compared the evidence of Tyler's financial and emotional involvement in the present case to the evidence of the biological father's involvement in the *Baby Boy W.* case.  There, as in *H.R.*, the Court of Appeal *affirmed* a finding that the biological father was a *Kelsey S.* presumed father.  (*Baby Boy W.*, *supra*, 232 Cal.App.4th at p. 450.)  Thus, in both *H.R.* and *Baby Boy W.*, the appellate courts considered the evidence that supported a finding that the biological father *was* a *Kelsey S.* presumed father, whereas we are considering the evidence that supports a finding that Tyler *is not* a *Kelsey S.* presumed father.  In neither situation does the appellate court review the substance of the evidence that might have supported a different finding.  Thus, we do not review the record in this appeal to determine whether it contains evidence to support a finding that Tyler may be a *Kelsey S.* father.

16

In numerous places in his opening brief, Tyler suggests that because Jessica "went into hiding at" or "disappeared to" the maternity home, he was disadvantaged in establishing his commitment to parental responsibilities for purposes of the *Kelsey S.* presumed father analysis. We disagree both with Tyler's characterization of Jessica's move and with the proposition that her move adversely affected his ability to demonstrate the requisite commitment to parental responsibilities. The uncontradicted evidence is that Jessica moved to the maternity home in early June 2014 not to hide or disappear, but *because she was receiving no financial or economic support from Tyler.* Moreover, Tyler's suggestion that Jessica was hiding or had disappeared is disingenuous: *within two days of Jessica's move*, Tyler's mother contacted Jessica's father, received a number at which Jessica could be reached, and from that number obtained the address of the maternity home; *less than a week later*, Tyler's mother went to the maternity home and served Jessica with court process in Tyler's paternity action; and *within the next month* Tyler (and his mother) visited Jessica at the maternity home. Given this chronology, the change in circumstances gave Tyler the perfect opportunity to demonstrate parental responsibilities if he had been so committed.

B.     *Failure to Comply with ICWA's Duty of Inquiry Requires a Reversal*

"ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, [certain] proceedings which terminate parental rights. [Citations.] ICWA contains provisions for notice to the tribes and specifies certain findings that must be made prior to termination of parental rights when an Indian child is involved." (*In re*

17

*Adoption of Hannah S.* (2006) 142 Cal.App.4th 988, 994-995.)  In particular, ICWA applies to private adoption proceedings where parental rights may be terminated.  (*In re Jonathon S.* (2005) 129 Cal.App.4th 334, 338, citing 25 U.S.C. §§ 1903(1), 1911(a)-(c), 1912-1921; see Welf. & Inst. Code, § 224 et seq.; rule 5.480 et seq.)

Rule 5.480 provides in part:  "This chapter addressing [ICWA] . . . , as codified in various sections of the California Family, Probate, and Welfare and Institutions Codes, applies to most proceedings involving Indian children that may result in . . . termination of parental rights . . . or adoptive placement."  (Citation omitted.)  Rule 5.481(a) is entitled "Inquiry" and directs in part:  "The court, court-connected investigator, and party seeking a . . . termination of parental rights, or adoption have an affirmative and continuing duty to inquire whether a child is or may be an Indian child in all proceedings identified in rule 5.480."  In the present appeal, this directive applies to the *trial court, the Agency and the P.'s*.  (Rule 5.481(a).)  This rule continues with two additional requirements:  (1) *the P.'s* were required to "ask . . . [both of Josiah's] parents . . . whether the child is or may be an Indian child and must complete the *Indian Child Inquiry Attachment* (form ICWA-010(A)) and attach it to the petition"; and (2) at the P.'s first appearance, *the court* was required to "order [Tyler] . . . to complete *Parental Notification of Indian Status* (form ICWA-020)."  (Rule 5.481(a)(1) & (2).)

Rule 5.481's duty to inquire "attaches to *any* proceeding which may result in termination of parental rights or adoptive placement."  (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1387 (*Noreen G.*) [termination of parental rights in guardianship proceeding].)  Thus, upon the filing of the P.'s underlying action and the P.'s first

18

appearance, *the court, the Agency and the P.'s* were all "vested with the affirmative and continuing duty pursuant to rule 5.481(a) to inquire whether [Josiah is] or may be [an] Indian child[]." (*Ibid.*) The record on appeal discloses that the P.'s complied with rule 5.481 with regard to Josiah's mother (Jessica), but is void of any attempt by *the court, the Agency or the P.'s* to comply with rule 5.481 with regard to Josiah's father (Tyler) — despite Tyler's full participation in the underlying proceedings.

The breaches of this duty to inquire into Josiah's possible Indian heritage are error that necessitates " 'a limited reversal . . . and remand for proper inquiry and any required notice [that] may be necessary.' " (*Noreen G.*, *supra*, 181 Cal.App.4th at p. 1387.) A parent like Tyler " 'does not necessarily waive an ICWA notice issue by failing to raise it below.' " (*Id.* at p. 1385.) That is because ICWA's notice requirements " ' " 'serve the interests of the Indian tribes "irrespective of the position of the parents" and cannot be waived by the parent.' " ' " (*Ibid.*)

We acknowledge that not every breach of the duty to inquire under rule 5.481(a) requires a reversal; noncompliance with the inquiry requirement may be harmless error. (*Noreen G.*, *supra*, 181 Cal.App.4th at pp. 1387-1388.) However, where the parent makes an offer of proof on appeal that the child has Indian heritage, the parent establishes a sufficient miscarriage of justice such that the error is not harmless. (*Id.* at p. 1388.) In the present appeal, we accept Tyler's offer of proof that, had inquiry been made, he would have replied that he is of Indian ancestry.

Tyler asks that we (1) "augment [the] record with additional evidence on appeal" (capitalization omitted) by accepting his declaration in which he asserts his Indian

19

ancestry and a corresponding basis on which Josiah is "eligible for membership in the Pueblo of Taos Indian Tribe of New Mexico,"[18] and (2) take judicial notice that the "Pueblo of Taos, New Mexico is an Indian Entity recognized by the federal government" for purposes of ICWA. In response, the P.'s ask that we take evidence, in a declaration from counsel, regarding membership eligibility requirements of the Pueblo of Taos, New Mexico tribe. Implicit in all three requests is that we make findings of fact regarding Tyler's Indian ancestry, if any.

Code of Civil Procedure section 909 and rule 8.252(b) and (c), which govern the taking of additional evidence and the finding of facts on appeal, have limited application. We invoke section 909 " 'sparingly.' " (*Noreen G.*, *supra*, 181 Cal.App.4th at pp. 1388-1389.) " ' " '*Absent exceptional circumstances*,' " ' " we do not issue findings of fact; and this appeal does not offer "any 'exceptional circumstances' that warrant the taking of additional evidence from either party." (*Id*. at pp. 1388, 1389.) For these reasons, we deny the motions to take evidence. Without the additional evidence relating to Tyler's alleged Indian ancestry, Tyler's motion to take judicial notice of a federally recognized Indian tribe is not necessary to the determination of any issue in this appeal; we accordingly deny the motion. (*Piccinini v. California Emergency Management Agency* (2014) 226 Cal.App.4th 685, 690.)

---

18    We consider Tyler's motion to augment the record a motion to take evidence, since an augmentation is limited to a "document filed or lodged in the case in superior court" or a "certified transcript — or agreed or settled statement — of oral proceedings" not previously designated. (Rule 8.155(a)(1)(A), (B).) The declaration that Tyler asks us to consider was not filed or lodged in the superior court and is not a transcript of proceedings.

## DISPOSITION

The judgment is reversed and the case is remanded to the juvenile court with directions that the court ensure compliance with the notice provisions of ICWA. If, after proper notice, a tribe claims Josiah is an Indian child, then the court shall proceed in conformity with all provisions of ICWA. If, alternatively, no tribe claims Josiah is an Indian child, then the court shall reinstate the judgment terminating Tyler's parental rights.

IRION, J.

WE CONCUR:

McDONALD, Acting P. J.

O'ROURKE, J.