Filed 8/19/25  In re L.J. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re L.J., a Person Coming Under the Juvenile Court Law. | C102008 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES, | (Super. Ct. No. JD242482) |
| Plaintiff and Respondent, | |
| v. | |
| E.J. et al., | |
| Defendants and Appellants. | |

Three-month-old L.J. was removed from the custody of her mother, M.C. (mother), after mother was incarcerated.  L.J.'s biological father, E.J. (father), was also incarcerated when L.J. was removed from mother's custody.  L.J. was placed with a family member, C.P., after notice to and without objection by mother and father (parents), who participated in the hearings.  The juvenile court denied reunification

1

services to the parents and set a Welfare and Institutions Code[1] section 366.26 selection and implementation hearing (section 366.26 hearing) to terminate parental rights and make L.J. available for adoption.

Prior to the section 366.26 hearing and after father had been released from prison, father requested visitation with L.J., which the juvenile court granted. Father completed five visits with L.J. Despite father's efforts during those visits, L.J. did not bond with father and expressed discomfort in his presence. Father filed a section 388 petition to be considered L.J.'s presumed father, requesting custody of L.J. or, in the alternative, reunification services. The juvenile court denied father's petition and entered an order terminating parental rights following the section 366.26 hearing.

Father, mother, and L.J. appeal the trial court's ruling on the section 388 petition, arguing father should have been deemed a presumed father, the juvenile court applied the incorrect reunification period, and the juvenile court abused its discretion in finding father's request for custody or reunification services was not in L.J.'s best interests. They also argue that the order terminating parental rights should be reversed because the juvenile court erred in not applying the beneficial parent-child relationship exception. Finally, they assert the inquiries under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) were insufficient, requiring reversal of the termination of parental rights order. The County of Sacramento's Department of Child, Family, and Adult Services (Department) concedes the ICWA inquiry was insufficient but disagrees with the remainder of the arguments.

We conditionally reverse the order terminating parental rights and remand the matter for the limited purpose of complying with the ICWA and related requirements. In all other respects, we affirm.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

BACKGROUND

We set forth the pertinent background facts here to provide context for this appeal. We include additional specific facts as to the arguments in the applicable sections of the Discussion as necessary.

L.J. was born in February 2023, with methamphetamine and/or amphetamine and fentanyl in her system. Mother agreed to a safety plan with drug and alcohol testing and services upon her discharge from the hospital. Mother reported to a social worker that E.J. was L.J.'s father and, "when [he] found out she could not get an abortion, he took off."[2] In April 2023, mother was arrested for leaving L.J. unattended at a restaurant and having drug paraphernalia on her person.[3] Mother had a prior warrant for her arrest and was facing between 32 months and six years in prison for the pending charges. Due to a prior strike conviction, mother was presumptively ineligible for probation. L.J. was placed in a confidential foster home under a protective emergency placement.

In May 2023, the Department filed a petition to have L.J. declared a dependent of the court, alleging, among other things, that L.J. had tested positive for methamphetamine at birth, mother had refused or failed to rehabilitate from a substance abuse problem, and mother left L.J. without any provisions for support because she had been incarcerated.

Mother and father were present at the initial hearing in May 2023. The juvenile court ordered the Department to arrange paternity testing and ordered the parents to disclose information of any maternal or paternal relative to be assessed for potential placement.

---

[2] In the Department's interview with father on June 29, 2023, father confirmed he had received and read the reports submitted to the juvenile court, which included the foregoing statement. Father does not argue that he disputed mother's statement.

[3] Mother disputed that she left L.J. unattended.

In the first addendum to the jurisdiction and disposition report, filed on July 10, 2023, and served on mother and father the same day, the Department, among other things, summarized its interviews with mother and father, explained no voluntary declaration of parentage was on file for L.J. but the paternity test showed father was L.J.'s biological father, and discussed a relative assessment and home evaluation for C.P., a maternal second cousin, for potential placement of L.J.[4]

In her interview with the Department, mother acknowledged that she knew a warrant had been issued for her arrest. She said she was " 'hiding' to avoid being caught," which was why she had limited prenatal care and did not obtain public assistance. Mother explained she and father agreed that mother would " 'stay out of jail and not get caught' " until father was released from prison, at which time he would take L.J. Mother said the stress from "knowing she had a warrant and trying to care for" L.J. contributed to her substance use. Mother expressed a desire to reunify with L.J. upon her release from incarceration and wanted L.J. placed with either the maternal grandmother or a maternal aunt. The Department noted that mother's earliest possible eligible parole date was in December 2024, which was beyond the six-month period for reunification services.

In father's interview with the Department, father said he had been sober for two years and did not use drugs with mother. He said mother " 'was living a different lifestyle' " when they met and father " 'tried to help her get on the right track' " because he knew she " 'was using on and off.' " When asked about the desired outcome in the dependency proceeding and whether he wanted custody of L.J., father replied, " 'Well, if she is mine.' " After the social worker informed him that he was L.J.'s biological father, father said, " 'Oh, okay. When I get out, I will be starting over. I won't have the means

---

[4] Nothing in the record indicates that mother or father objected to the potential placement with C.P. following receipt of this addendum.

4

to provide for her (the child). I do want to be a part of her life, but I won't have the place or a means to provide for her. It is my intention to raise her some day when I can get on my feet.' " Father said he and mother had discussed placement of L.J. and both wanted the maternal grandmother to take her.

On July 11, 2023, the juvenile court found E.J. to be L.J.'s biological father.[5] Approximately one month later, the Department filed and served a second addendum to the jurisdiction and disposition report, wherein it stated, among other things, that L.J. was placed in C.P.'s care on July 18, 2023, C.P. reported L.J. was adjusting well, and C.P. was supervising visits between the maternal grandmother and L.J.'s maternal half sibling.

The jurisdictional and disposition hearings were jointly held on September 19, 2023. Father waived his right to be present at the hearing but was represented by counsel. Father's counsel argued it was in L.J.'s best interest to offer him reunification services as the biological father and objected to the juvenile court setting a section 366.26 hearing. Mother also objected to the juvenile court setting a section 366.26 hearing and objected to the Department's recommendation that bypass provisions applied to preclude reunification services as to her. L.J.'s counsel agreed with the Department's recommended findings and orders.

The juvenile court found the allegations in the petition to be true and found by clear and convincing evidence there would be a substantial danger to L.J.'s physical health, safety, protection, or emotional well-being if she were to live with either mother or father, and there was no reasonable means to protect her without removal from their custody. The court ordered no reunification services to the parents and declared L.J. to be a dependent child of the juvenile court. The court further ordered no visitation between L.J. and the parents during the parents' incarceration, but provided visits could be supervised, observed, or unsupervised at the discretion of the social worker upon

---

[5] There is no reporter's transcript for this hearing.

5

either parent's release from incarceration.  The court set an ICWA compliance hearing and the section 366.26 hearing, and advised the parents of their rights to appeal the jurisdiction and dispositional findings.

On October 31, 2023, the juvenile court found the ICWA did not apply because there was no reason to believe or know that L.J. is an Indian child.  The section 366.26 hearing was continued several times because one or both parents were not made available to attend the hearing.  After being released from incarceration on February 5, 2024, father attended the continued hearing on March 26, 2024, which was again continued because mother was not present.  During that hearing, father requested visitation with L.J.; the juvenile court granted father's request and ordered one visit per week.  The maternal grandmother and G.M., a person identified by mother's counsel as the paternal grandmother,[6] were also at the hearing.  Mother's counsel told the court that the two grandmothers indicated to him that they had been reaching out to the Department to request placement and that he would forward their information along to the Department to have an assessment of placement done before the next court date.  The juvenile court concluded the hearing by stating the Department would contact the grandmothers prior to the next hearing.

The Department filed an addendum to its selection and implementation report on April 19, 2024.  The social worker detailed a discussion with the maternal grandmother, who said she initially wanted placement of L.J. but did not follow through with her resource family approval (RFA) application due to her background.[7]  The maternal grandmother said C.P. was the "best option" and she could not have " 'picked a better

---

[6]  As explained *post*, G.M. is not the paternal grandmother but is the maternal grandmother to one of L.J.'s paternal half siblings.

[7]  During the March 2024 hearing, the maternal grandmother told the juvenile court she was never informed of the RFA process.

person' " because C.P. " 'is an amazing mother to her children.' " The maternal grandmother was in agreement that L.J. was " 'in a good place' " and said she "closed her RFA application."

The social worker also contacted G.M., who clarified that she was not L.J.'s paternal grandmother but was instead the maternal grandmother to one of L.J.'s paternal half siblings. G.M. reported that father notified her when L.J. was born and told her the child was in foster care. G.M. said she contacted the Department to request placement of L.J. and was interested in sibling contact.

On April 8, 2024, the social worker contacted the RFA department to inquire as to the maternal grandmother's application. The staff reported that the maternal grandmother reopened her RFA application on April 1, 2024. The maternal aunt also submitted an RFA application. The social worker's assessment recommendation was that placement with either the maternal grandmother or the maternal aunt was not appropriate. The social worker also assessed L.J.'s other maternal aunt and uncle for possible placement and found placement would not be appropriate. The Department wrote it had made "diligent efforts to assess all relatives that have come forward seeking placement of the child" and recommended that L.J. remain in her placement with C.P. for her overall well-being and in her best interest.

On April 22, 2024, the Department filed another addendum to its selection and implementation report. The purpose of the addendum was to provide an update regarding the weekly visits between L.J. and father. The report states L.J. was initially clingy to C.P. at the first visit and would not face father, however, she later became comfortable enough to face him while sitting on C.P.'s lap. Father appeared understanding and tried to engage L.J. with his cellphone.

When the Department suggested a second visit between L.J. and father whereby a social worker would transport L.J. the approximately three-and-a-half-hour drive (excluding stops to attend to L.J.) each way between Clovis, where L.J. was placed, and

7

Sacramento, where father lives, C.P. expressed concern. C.P. said L.J. did not do well on long-distance drives, did not like men, and did not do well with strangers. The Department wrote: "Due to her young age, her distress on long car rides, her behaviors towards the father and the fact that the child lacks a relationship with the father, in-person visits are not beneficial to the child." The Department further noted that father was released from incarceration on February 5, 2024, and waited over a month and a half before requesting visits at the March 2024 court hearing. During that time, father did not contact the Department to inquire into L.J.'s well-being or request visits.

On April 23, 2024, the juvenile court held the continued section 366.26 hearing, which was again continued due to mother's absence. Father, the maternal grandmother, and the paternal grandmother attended the hearing. Father requested to continue having visits with L.J. until the next hearing and for the Department to assess placement with the paternal grandmother, N.B. The juvenile court ordered the Department to assess the paternal grandmother for placement. The Department asked the court to reduce the number of visits between father and L.J. due to L.J.'s difficulty traveling long distances. Father objected to that request, stating the Department could "be creative" and "try for some halfway point to lessen the amount of time the child has to be in the car."

On May 9, 2024, the Department filed another addendum to the selection and implementation report, stating the paternal grandmother did not submit an RFA application and declined to move forward with potential placement after being advised that father could not live in the same house as L.J. and "the Department was not looking to remove the child from her current placement."

The Department also explained that when it tried to schedule visits between father and L.J., father responded that he needed the visits to occur during the weekend because he was working and attending school and was unable to miss class. Father rejected the Department's attempts to schedule after-work visits an hour and a half away, to which C.P. had agreed. When the social worker told father the Department could not

8

accommodate a weekend visit, father responded: " 'That's funny because my last visit was on the weekend but its [*sic*] okay ill [*sic*] ask the judge to accommodate me somehow and see what I can get figured out that way. Thank you I have to work after school." The social worker responded that she was able to accommodate the prior weekend visit but could not do so that month. The social worker scheduled the next visit for the afternoon of May 15, 2024, to allow father sufficient time to accommodate his schedule.[8]

In its June 21, 2024 addendum to the selection and implementation report, the Department wrote that in visits between L.J. and father, L.J. showed no interest in engaging with father unless he showed her cartoons on his phone, and she showed no emotional attachment to him. Father "made several attempts to engage" with L.J. and was patient with her. As to further placement assessment, the Department wrote that the maternal grandmother was denied placement, the maternal aunt was "ruled out," and the paternal grandmother "elected to halt" the RFA process once she learned she "would be denied for placement as the father resides in the home."

On July 18, 2024, father filed a request under section 388 to change the trial court's September 19, 2023 order denying reunification to father and setting the section 366.26 hearing. Father requested that the trial court vacate the section 366.26 hearing and place the minor in his custody. In the alternative, father requested reunification services.

Father argued that, following his release from prison, he had "turned his life around" by being compliant with the requirements of his parole and being "a productive member of society" in that he was employed and attending college to become an

---

[8] The remainder of the report details disputes among family members as to who took care of L.J. during certain periods of her placement, allocation of placement funding, and arrangements or purported understandings as to her ultimate placement, none of which are pertinent to the issues presented on appeal.

9

automotive technician. Father explained he had stable and appropriate housing with his brother, and his mother, who lived down the street, would provide daycare for L.J. Father stated he had built a relationship with L.J. through his "four to five visits and their bond and familiarity ha[d] grown." He further asserted L.J. was comfortable with him at the last visit during which he fed her, she sat on his lap, they played, and she ran to him.

As to why the requested order would benefit L.J., father wrote that he grew up in a loving, supportive home with good morals. Although he "went down a bad path for a period," he was now practicing good morals and being responsible. Father believed it was in L.J.'s best interest to be surrounded by her father and family, including her siblings. Father asserted he could provide consistency and stability to L.J., noting L.J. had previously "gone back and forth" between the maternal grandmother and C.P.

In the August 27, 2024 addendum to the selection and implementation report, the Department addressed father's section 388 motion. The Department noted L.J. has two paternal half siblings, J.J. and K.J. Father's parental rights were terminated as to J.J. in 2016. In that proceeding, father's status was an alleged father; he did not visit J.J. or contact the Department to inquire into her well-being. K.J. was born in 2017. G.M. is K.J.'s maternal grandmother and has been the child's legal guardian since birth. Father has had regular visits with K.J. but has not attempted to obtain custody of her or to become a co-guardian.

As to further visits between father and L.J., the Department wrote that L.J. had not adjusted well to visiting with father. L.J. cried when she was handed to father and was very clingy with C.P. for a few days following the visits. During a visit in August 2024, L.J. did not willingly go to father. Father made attempts to interact with and engage her through books from the bookshelf, cartoons on his phone, and a bottle of bubbles he brought to the visit. L.J. enjoyed the bubbles. When L.J. became fussy, father attempted to soothe her, but L.J. would not calm down for him. L.J. was teething and had a runny nose. Father wiped her face often and was loving and attentive to her needs, but L.J.

10

continued to cry and pointed toward the door. When L.J. stepped into the lobby, she saw the family friend who had transported her to the visit, ran to him, calmed down, and appeared very comfortable. She sat on the family friend's lap for the remainder of the visit with father. After father left, L.J. visited with the maternal grandmother and her maternal half sibling. L.J. ran to the maternal grandmother and gave her a hug; L.J. did not cry during her visit with the maternal grandmother.

The Department wrote it did not believe that placing L.J. in father's custody or offering father reunification services was in L.J.'s best interest because: father had not demonstrated his ability or willingness to parent J.J. and K.J. and had not sought custody or guardianship of K.J.; father did not contact the Department to inquire about L.J. while he was incarcerated; father did not contact the Department regarding or seek visits with L.J. following his release on February 5, 2024, and instead waited until the March 26, 2024 hearing to request visits; and during the visits between L.J. and father, L.J. cried when she was handed over to him, displayed discomfort around him, did not show affection toward him, and would not let him comfort or soothe her (in comparison to her responses to the family friend who transported her to the visit and the maternal grandmother). The Department further stated reunification services should be bypassed due to father's prior violent felony conviction.

On August 30, 2024, the juvenile court held the contested section 388 and section 366.26 hearings concurrently. Only two witnesses testified at the hearing: a social worker and father. The social worker testified father had five visits with L.J. and spent approximately seven to 10 hours with her over the course of five months; he was attentive and loving toward L.J. and sought to engage her during the three visits observed by the social worker; and father missed one visit because of work or school. The social worker further testified there was no bond between L.J. and father; L.J. did not enjoy the visits and showed no attachment to father or any desire to go to him—except when he played cartoons on his phone, which she watched for a short period of time.

11

Father testified he put his name on a long waitlist for services while he was incarcerated but never participated in services. He said he was compliant with his probation requirements, employed part-time, and studying to be an automotive technician. At school, father had perfect attendance and was on the honor roll. Father expected to graduate from school in January 2025, and lived with his brother, his brother's wife, and three nieces. Father said L.J. could live with him in his brother's house.

When asked why he did not immediately seek visits with L.J. following his release from incarceration, father testified he believed that since no reunification services were being offered and the focus was adoption, "there was pretty much nothing [he] could do." He said he reached out to his mother and "asked her to step forward" while he was incarcerated. As to his relationship with L.J., father testified his interactions with L.J. changed during their visits when C.P. was not there and, although L.J. would cry during handoff, she would eventually start to engage and play with him, and allowed him to feed her. Father believed L.J. recognized him because she would constantly look over at him during the visits.

Father addressed questions regarding his criminal background and substance abuse. He testified that he had to learn to cut people out of his life when they were not beneficial to his lifestyle and goals, and that he attended a rehabilitation program. Father did not receive a certificate of completion from the rehabilitation program because he left after his possessions were stolen and because one of his roommates was mentally unstable. Father testified he nonetheless has been sober since 2021.

As to his relationship with his other children, father testified the caregiver to his child in foster care has concerns about the child having interactions with father, but he regularly visits with his other child. If reunification services were provided, father said he would not let his work and school schedule interfere with his visits and would commit

12

to two visits per week. He said he was available on the weekends and after 6:00 p.m. during weekdays.

On September 10, 2024, the juvenile court ruled there was an insufficient factual basis for father to rise to the level of a presumed father and found that he remains a biological father. The juvenile court next addressed questions raised by the parties as to whether there were sufficient assessments of various relatives for placement, in particular paternal relatives. The court explained L.J. was placed with and remained with a family member, however, many members of the family, including the paternal grandmother, knew that L.J. spent most of her time during the initial months of the case with the maternal grandmother who could not pass the emergency placement assessment. Father lived with the paternal grandmother when she alerted the Department to this fact and father testified that he had a very close relationship with the maternal grandmother. The court found it "possible, if not likely," that father thus knew that L.J. was not actually in the placement ordered by the court and said "that point" is "relevant to the question of why and whether other assessments were or were not done during that time period."

Turning to the section 388 motion, the juvenile court found father's "circumstances have changed rather drastically and definitely to the better," but the question as to whether the requested relief would be in the best interest of L.J. was "a much harder question." The juvenile court said there was no evidence that father and L.J. had established a bond as a result of their visits and L.J. was "not always comfortable with him." The court further noted that as to the request for reunification services, father was merely a biological father, and he has a qualifying violent felony conviction that would bypass services. Father would also only have a period of two months for those services to take place prior to the expiration of the 18-month reunification period and there was no "basis in the evidence to believe that there would be a significant change" in the relationship between L.J. and father during those two months because father lived a substantial distance from L.J. and had more than a full-time schedule between work and

13

school. The juvenile court found the requested relief accordingly would not be in L.J.'s best interest and denied the section 388 motion.

The juvenile court then addressed the termination of parental rights. First, the court found L.J. adoptable. Next, the court rejected father's assertion that the beneficial parent-child relationship exception precluded termination of his rights. Although father met the visitation requirement under the exception, the court found the evidence insufficient to sustain the other two requirements—i.e., that L.J. would benefit from continuing the relationship with father and that terminating the relationship would be detrimental to L.J. The juvenile court found no evidence "of a sufficient relationship" or "that the harm of terminating that relationship would outweigh the benefits of permanency through adoption." The court then found, by a preponderance of the evidence, that the return of L.J. to the physical custody of her parents would create a substantial risk of detriment and, by clear and convincing evidence, that L.J. is likely to be adopted. The court declared L.J. permanently freed from the custody and control of her parents and ordered that she be placed for adoption. L.J., father, and mother appeal.

DISCUSSION

I

*L.J. Has Standing on Appeal*

L.J. argues she has standing to challenge the juvenile court's denial of father's section 388 motion and the order terminating parental rights because she has cognizable constitutional rights under the First and Fourteenth Amendments to preserve her parent-child relationship with her biological father, and because her counsel litigated against the orders in the juvenile court. Father and mother join in this argument. The Department does not challenge L.J.'s standing. We agree L.J. has standing to challenge the orders because she is a party aggrieved by the orders. (*In re Aaron R.* (2005) 130 Cal.App.4th 697, 703.)

14

## II
### *The Juvenile Court Did Not Err In Denying Father's Section 388 Motion*

L.J. argues the juvenile court erred in denying father's section 388 motion because he was a presumed father, the court failed to apply the 24-month reunification period afforded to previously incarcerated parents, and the court abused its discretion in finding it was not in L.J.'s best interests to be placed in father's custody.  Father and mother join in these arguments.  We disagree.

A.    *Legal Background*

The dependency system recognizes four categories of fathers:  alleged, biological (or natural), presumed, and de facto.  (*In re E.T.* (2013) 217 Cal.App.4th 426, 436-437.) "A father's status is significant in dependency cases because it determines the extent to which the father may participate in the proceedings and the rights to which he is entitled." (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.)  The categories at issue here are biological and presumed.  A biological father means paternity has been established, but the person has not yet achieved presumed father status.  (*In re A.A.* (2003) 114 Cal.App.4th 771, 779.)  A presumed father is a person who falls within one of several categories enumerated in Family Code section 7611.  (*In re Vincent M.* (2008) 161 Cal.App.4th 943, 954 & fn. 11.)  Only a presumed father is entitled to reunification services and possible custody of the child.  (*In re E.O.* (2010) 182 Cal.App.4th 722, 726.) That is because " 'parental rights are generally conferred on a man not merely based on biology but on the father's connection to the mother [and/or] child through marriage (or attempted marriage) or his commitment to the child.' "  (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449.)

"While a biological father is not entitled to custody under section 361.2, or reunification services under section 361.5 if he does not attain presumed father status prior to the termination of any reunification period, he may move under section 388 for a hearing to reconsider the juvenile court's earlier rulings based on new evidence or

15

changed circumstances" demonstrating it is in the child's best interests to grant reunification services or custody. (*In re Zacharia D.*, *supra*, 6 Cal.4th at p. 454, fn. omitted; *In re Vincent M.*, *supra*, 161 Cal.App.4th at p. 955.) "[T]he burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) "The petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.)

   B.  *Father Is a Biological and Not a Presumed Father*

   L.J. argues the juvenile court erred in denying father's motion to be elevated from biological father to presumed father because the court misunderstood and misapplied the law, and its order is not supported by substantial evidence. We find no merit in these arguments.

   First, to the extent L.J. asserts father qualified as a presumed father under Family Code section 7611, subdivision (d), which states a man is a presumed father if he "receives the child into their home and openly holds out the child as their natural child," we disregard the argument for want of analysis. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146 [claims may be deemed forfeited for want of cogent argument supported by legal analysis and citation to the record].) L.J. references the statutory provision several times but does not present a reasoned argument with citations to the record that application of the provision was argued for and satisfied under the facts of this case—i.e., that father received L.J. into his home.

   Second, the juvenile court did not abuse its discretion in finding father did not qualify as a *Kelsey S.* father. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*)) In *Kelsey S.*, our Supreme Court held that a biological father who does not meet the statutory criteria to qualify as a presumed father may attain parental rights equal to those

16

of the mother by showing he promptly stepped forward to assume full parental responsibilities for the child's well-being, including a financial, emotional or other commitment; the child's mother or a third party prevented him from assuming his parental responsibilities or physically receiving the child into his home; and he demonstrated a willingness to assume full custody of the child. (*In re Jason J.* (2009) 175 Cal.App.4th 922, 932; *In re D.M.* (2012) 210 Cal.App.4th 541, 545.) A biological father cannot attain those parental rights "unless he shows that *he promptly came forward and demonstrated as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted* within a short time after he learned or reasonably should have learned that the biological mother was pregnant with his child." (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1060, italics added.) In making that determination, the juvenile court considers the father's conduct before and after the child's birth, including whether he publicly acknowledged paternity, paid pregnancy and birth expenses commensurate with his ability to do so, and promptly took legal action to obtain custody of the child. (*Kelsey S.*, at p. 849.)

L.J. asserts father qualified as a *Kelsey S.* father because he publicly acknowledged paternity, took "active steps" by contacting the paternal grandmother during his incarceration to secure L.J.'s placement with her, and sought to establish a relationship with L.J. through their five visits following his release from prison. We disagree.

Initially, L.J.'s assertion that father contacted the paternal grandmother during his incarceration to ensure L.J.'s placement with her is not supported by her citations to the record. The first citation is to pages 153 and 154 in volume 1 of the clerk's transcript, which contains the first addendum to the jurisdiction and disposition report. Therein, the social worker set forth a discussion with father, during which father was asked whether he wanted anyone specific considered for placement. Father responded that he and mother agreed on placement with the *maternal* grandmother; there was no mention of the

17

*paternal* grandmother. L.J. also cites page 353 in volume 2 of the clerk's transcript, which contains the May 9, 2024 addendum to the selection and implementation report. That page contains a summary of the discussion between the social worker and the paternal grandmother as to her request for placement; however, there is no mention of father asking the paternal grandmother to apply for placement and the discussion occurred after father had been released from prison.[9] We are aware that father testified he asked his mother "to step forward" while he was incarcerated but father never mentioned potential placement with the paternal grandmother during *any* of the hearings that he attended while he was incarcerated.

Father's five visits with L.J. following his release from prison also did not carry his burden to demonstrate a full commitment to L.J. As explained *ante*, a biological father must demonstrate a full commitment to his parental responsibilities within a short time after he knew or reasonably should have known the mother was pregnant with his child. (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 583; *Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) He must "provide care and support for the mother's physical and emotional health to the extent it affects the health and welfare of the child she is carrying." (*Adoption of Baby Boy W.* (2014) 232 Cal.App.4th 438, 452, fn. 13.) There is substantial evidence in the record that father did not do so here.

Mother reported that, instead of assuming responsibility and providing support for her, father "took off" when he found out that she was pregnant and could not get an abortion. Mother further reported that she "had limited prenatal care and did not obtain public assistance" because father told her not to get arrested until he was released from prison, whereafter he would take care of L.J. Father and mother also spoke about L.J.'s

---

[9] To the extent L.J. argues the lack of placement evaluation and/or denial of placement as to the paternal grandmother violated section 361.3, we disregard it. The appeal does not encompass a challenge to any such determination and L.J. provides no reasoned argument in that regard.

18

placement before father learned of the paternity results. There is thus substantial evidence in the record showing father knew mother was pregnant with his child and he did not provide mother with care or support during pregnancy. Father's incarceration is no excuse for failing to assume his parental responsibilities to ensure the health and welfare of his child. (See *Adoption of O.M.* (2008) 169 Cal.App.4th 672, 680 ["[w]e do not discern any violation of equal protection or due process in holding an unwed father's own criminal activity against him when assessing whether he has met the criteria for *Kelsey S.* rights"]; *In re D.S.* (2014) 230 Cal.App.4th 1238, 1246 ["a father whose own bad decisions preclude him from carrying out his parental responsibilities does not satisfy the high bar set by *Kelsey S.*"].)

Father's lack of commitment to his parental responsibilities during pregnancy is particularly notable because he admitted that he knew mother had a history of using drugs and said he had previously " 'tried to help her get on the right track.' " A father's willingness to provide emotional, financial, medical, or other assistance during pregnancy is particularly important when he knows or reasonably should know that the mother needs assistance. (See *Adoption of Baby Boy W.*, *supra*, 232 Cal.App.4th at p. 452.) As our Supreme Court explained: "To the extent the mother needs . . . critical assistance and the unwed father is able to provide it, the father, as one of the two individuals responsible for the pregnancy, should be encouraged to do so early on and should not be granted constitutional protection [as provided in *Kelsey S.*] after birth if he has failed to timely fulfill this responsibility." (*Adoption of Michael H.*, *supra*, 10 Cal.4th at p. 1056.) A father "cannot compensate for his failure to [promptly come forward to offer support] by attempting to assume his parental responsibilities many months *after* learning of the pregnancy." (*Id.* at p. 1054; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610 [childhood cannot wait for a parent to establish readiness for parenting].)

There is also substantial evidence in the record that father lacked commitment to L.J. after birth as demonstrated by his statements during his incarceration and his actions

following his release from prison. While incarcerated, father said he would not have the place or means to provide for L.J. upon his release but intended to " 'raise her some day when [he] can get on [his] feet.' " Father did not contact the Department to inquire about L.J. either during incarceration or following his release, and he did not seek visitation immediately following his release from prison; he instead focused on finding employment and attending school. When a social worker tried to schedule visits with father, father requested accommodations to fit his work and school schedule. Father thus appeared to prioritize his work and school schedule over his visits with L.J.

Taken together, the evidence of father's willingness to assume full parental responsibilities was, at best, tepid and late in the proceedings. The record contains substantial evidence that father did not promptly show a commitment to his parental responsibilities, and we find no basis for concluding the juvenile court's denial of his request to be deemed a *Kelsey S.* father was arbitrary, capricious, or outside the bounds of reason. Given this conclusion, we do not address L.J.'s argument that the Department and juvenile court thwarted father's efforts to assume his parental responsibilities.

C.  *Father Was Not Entitled to Consideration of a 24-Month Reunification Period*

L.J. argues the juvenile court erred as a matter of law in failing to apply a 24-month reunification period under section 366.22, subdivision (b) and section 361.5, subdivision (a)(3), due to father's prior incarceration, when it considered whether reunification services would be in L.J.'s best interests. Father and mother join in this argument. There are several problems with this argument.

First, we fail to see how section 361.5, subdivision (a)(3) advances L.J.'s argument because nothing therein addresses a 24-month reunification period. Section 361.5, subdivision (a)(3) provides a juvenile court may extend court ordered services up to a maximum period not to exceed 18 months under certain circumstances and if specific findings are made.

20

Second, section 366.22, subdivision (b) provides the juvenile court *may* extend the date of the permanency review hearing to occur from within 18 months to within 24 months of the date the child was taken from the physical custody of their parent(s) *if*, among other things, the court determines by clear and convincing evidence that additional reunification services to a parent who was recently discharged from incarceration would be in the best interests of the child and the parent is making significant and consistent progress in establishing a safe home for the child's return. (§ 366.22, subds. (a)(1), (b)(1).) The 24-month period provided under section 366.22, subdivision (b) is accordingly *discretionary*, not mandatory, and the juvenile court could not have erred *as a matter of law* in considering an 18-month reunification period instead of a discretionary 24-month reunification period when it ruled on the section 388 motion.

Finally, the juvenile court did not deny father's section 388 petition "primarily because he had only two months left of services." The trial court noted that, as a biological father, father had no right or entitlement to reunification services and father had a qualifying violent felony conviction that resulted in bypass of reunification services.

For these reasons, we find no merit in L.J.'s argument that the juvenile court erred in failing to apply a 24-month reunification period.

D. *The Juvenile Court Did Not Abuse Its Discretion In Denying the Section 388 Motion*

L.J. argues substantial evidence supported a finding that it was in her best interest to grant father custody, family maintenance and/or reunification services and liberalized visits. Mother joins in this argument. Father also joins in this argument and further asserts he met his burden of demonstrating a change in circumstance and that custody or reunification services were in L.J.'s best interests. We conclude the parties have failed to show the juvenile court abused its discretion in finding the requested relief was not in

21

L.J.'s best interests.  We accordingly do not address the parties' dispute as to whether father proved a change in circumstances.

Initially, as to L.J.'s argument, the question is not whether there is substantial evidence to support a finding in favor of father's request for relief.  Instead, a ruling on a section 388 petition is " 'committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established.' " (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1116-1117.)  We look to whether the juvenile court " ' "exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.)  Here, we cannot say the juvenile court exceeded the bounds of reason in denying the section 388 petition.

Father had the burden of proving by clear and convincing evidence that placing L.J. in his custody or providing him with reunification services was in L.J.'s best interests.  (Cal. Rules of Court, rule 5.570(h)(1)(C).)  In determining whether father carried his burden, "the court may consider the entire factual and procedural history of the case." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)  The court may consider factors such as:  "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.)  However, the court must also fully account for the shift in focus that happens after reunification services are terminated from family reunification toward promoting the child's needs for permanency and stability.  (See *In re J.C.* (2014) 226 Cal.App.4th 503, 526-527 [criticizing *Kimberly F.* to the extent it does not take into account this shift in focus].)  "A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift

22

of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) At this stage, there is a rebuttable presumption that continued placement is in the best interests of the child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.)

It is important to keep in mind that, where, as here, the court's ruling is against the party who has the burden of proof, it is extremely difficult to prevail on appeal by arguing the evidence compels a ruling in that party's favor. (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 734.) Unless the trial court makes specific findings of fact in favor of the moving party, we presume the trial court found the party's evidence lacked sufficient weight and credibility to carry the burden of proof. (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.)

Father asserts he was developing a bond with L.J. But the juvenile court expressly found there was no evidence of a bond between L.J. and father and L.J. was "not always comfortable with him." The juvenile court's findings are supported by substantial evidence through the Department's reports and the social worker's testimony at the hearing, which establish L.J. cried when she was handed over to father, displayed discomfort around him, did not want to engage with him unless cartoons were shown on the phone, did not show affection and was not attached to him, and would not let him comfort or soothe her. In contrast, in the June 21, 2024 addendum to the selection and implementation report, the social worker reported L.J. was flourishing in C.P.'s home.

There is also evidence in the record that father did not demonstrate a willingness to assume parental responsibilities for his two other children and did not complete a rehabilitation program relating to his substance abuse. L.J. and father further do not dispute the juvenile court's findings that father's qualifying violent felony would bypass reunification services. We have no power to reweigh the evidence on appeal (*Bookout v. State of California ex rel. Dept. of Transportation*, *supra*, 186 Cal.App.4th at p. 1486) and cannot on this record conclude that the juvenile court abused its discretion.

L.J. cites and discusses several cases in which appellate courts have reversed the denial of a section 388 petition but fails to explain how those cases apply to this appeal. We accordingly do not address those cases. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["citing cases without any discussion of their application to the present case results in forfeiture"].) We also do not address L.J.'s and father's arguments that father was illegally denied visitation with L.J. while incarcerated. Father did not appeal the dispositional order in which the juvenile court denied visitation during his incarceration; he has accordingly forfeited any challenge to that order. (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1150.)

### III
### *The Juvenile Court Did Not Err In Finding the Parental-Benefit Exception Inapplicable*

Father argues the juvenile court's order terminating parental rights must be reversed because it erred in finding the parental-benefit exception inapplicable under the circumstances. Mother joins in this argument. We disagree.

A parent may avoid termination of parental rights through the parental-benefit exception by establishing by a preponderance of the evidence that "the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. [Citations.] The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 629-630.) While application of the parental-benefit exception rests on a variety of factual determinations properly reviewed for substantial evidence, the juvenile court's ultimate decision is subject to review for abuse of discretion. (*Ibid*.) Application of the statutory exception applies only in

"*exceptional circumstances*" as "an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

Assuming without deciding that the regular visitation requirement was met, given the Department's concession on appeal, father cannot establish error as to the finding that he failed to prove L.J. would benefit from a continuing relationship with him. Father's entire argument of error is premised on his disagreement with L.J.'s placement in Clovis, his assertion that the paternal grandmother could provide childcare to L.J., his focus on L.J.'s relationship with the maternal grandmother, and his recitation of the purported agreement between C.P. and the maternal grandmother as to L.J.'s custody—none of which have any bearing on whether L.J. would benefit from continuing her relationship *with father*, which is the focus of the inquiry. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632 [under the second element of the inquiry, courts generally consider factors such as the age of the child, how long the child spent in the *parent's* custody, whether there were positive or negative interactions between the *parent* and child, and the child's particular needs].)

Father further asserts that L.J. would benefit from a continuing relationship with him by being "allowed a home life with extended family, good morals, an honest environment" and because father "acknowledged his past mistakes and had positive goals." But a "showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent" is insufficient. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) The parent must show that severing the parent-child relationship would deprive the child "of a *substantial*, positive emotional attachment" such that the child "would be *greatly* harmed." (*Ibid.*) Father has identified no evidence compelling a finding that he met this requirement by a preponderance of the evidence. Rather, substantial evidence in the record supports the juvenile court's finding that there was no evidence of a sufficient relationship between father and L.J. to show

L.J. would benefit from a continuing relationship with father because the social worker testified L.J. had *no* bond with and *no* attachment to father.

Because father has failed to show the juvenile court erred in finding father did not meet his burden under the second element of the inquiry, we do not consider or address father's arguments of error as to the third element. We conclude the juvenile court did not abuse its discretion in finding the parental-benefit exception inapplicable.

IV

*The Department's ICWA Inquiry Was Insufficient*

L.J. argues the Department and the juvenile court failed to comply with the inquiry requirements of the ICWA and, as a result, the juvenile court's findings that the ICWA did not apply are not supported and must be reversed. Father and mother join in this argument. L.J. also argues that, because of the failure to comply with the inquiry requirements, the notice sent to the Muscogee Creek Nation was defective. We accept and agree with the Department's concession that the record fails to show it conducted the requisite ICWA inquiries. We accordingly conditionally reverse the order terminating parental rights for the limited purpose of having the Department conduct an appropriate inquiry.

A.     *Background*

The record shows mother and her family denied having Native American ancestry. Father and the paternal grandfather, however, reported possible Native American ancestry. The Department sent a letter to the Muscogee Creek Nation with the information about the parents, the paternal grandfather, and the paternal great-grandparents.

In its October 16, 2023 ICWA compliance report, the Department detailed further conversations with the maternal grandmother and C.P., both of whom denied Native American ancestry, and its unsuccessful efforts to follow up with the paternal grandfather. The Department noted it had received a letter from the Muscogee Creek Nation stating L.J. was not eligible for membership. As to the paternal grandmother, the

26

Department noted there was no information available. The Department recommended that the juvenile court find there is no reason to believe or know L.J. is an Indian child and the ICWA does not apply.

At the ICWA compliance hearing on October 31, 2023, the juvenile court admitted the October 2023 ICWA compliance report into evidence and adopted the Department's recommended finding.

### B. *Remand Is Appropriate*

"The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings. [Citations.] A major purpose of the ICWA is to protect 'Indian children who are members of or are eligible for membership in an Indian tribe.' " (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) An " 'Indian child' " is defined as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) The juvenile court and the Department have an affirmative and continuing duty, beginning at initial contact, to inquire whether a child who is subject to the proceedings is, or may be, an Indian child. (Cal. Rules of Court, rule 5.481(a); § 224.2, subd. (a).) When the Department has a reason to believe that an Indian child is involved in a proceeding, the Department must make further inquiry regarding the possible Indian status of the child by interviewing, among others, the parents and extended family members to gather the requisite information. (§ 224.2, subd. (e)(2)(A).) We review claims of inadequate inquiry into a child's Native American ancestry for substantial evidence. (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430.)

L.J. asserts the Department failed to make a proper inquiry of the paternal grandmother and the paternal uncle as to the family's reported Indian heritage. The Department concedes that further inquiry is needed to comply with the ICWA. We

27

accept the Department's concession and accordingly conditionally reverse the order terminating parental rights with directions for the Department to conduct an adequate inquiry, supported by record documentation. (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125.)

DISPOSITION

The juvenile court's order denying modification under section 388 is affirmed. The order terminating parental rights is conditionally reversed and the matter is remanded for the limited purpose to require the Department to comply with the inquiry and notice provisions of the ICWA, as well as the requirements of sections 224.2 and 224.3 and the documentation provisions of California Rules of Court, rule 5.481(a)(5). If the juvenile court thereafter finds the further inquiry was proper and adequate, due diligence has been conducted, and concludes the ICWA does not apply, the order terminating parental rights shall be reinstated. If, however, the juvenile court concludes the ICWA applies, the juvenile court is ordered to conduct a new section 366.26 hearing and proceed in accordance with the ICWA and California implementing provisions. In all other respects, the orders are affirmed.

 

 

                                             /s/
                                 BOULWARE EURIE, J.

We concur:

 

    /s/
MAURO, Acting P. J.

 

    /s/
FEINBERG, J.